**Randy L. LATHROP, Plaintiff,**

v.

**The UNIDENTIFIED, WRECKED & ABANDONED VESSEL, Defendant.**

**STATE of FLORIDA, et al., Plaintiffs,**

v.

**Randy L. LATHROP, Defendant.**

Nos. 88–37–Civ–ORL–20, 90–605–Civ–ORL–20.

United States District Court, M.D. Florida, Orlando Division.

April 9, 1993.

**956**

Edward W. Horan, Key West, FL, for plaintiffs.

Kendall Wherry, Asst. U.S. Atty., Orlando, FL, Eric J. Taylor, Esq., Tallahassee, FL, Caroline Zander, Washington, DC, for defendant.

## ORDER

SCHLESINGER, District Judge.

This cause is before the Court on Plaintiff Randy L. Lathrop's Motion for Preliminary Injunction (Doc. No. 66) filed in Case No. 88–37 (*in rem* action). The United States has filed an *Amicus Curiae* Response in Opposition to Plaintiff's Motion for Preliminary Injunction (Doc. No. 81, filed on April 6, 1992).

## I

### PROCEDURAL BACKGROUND

These two consolidated cases involve a dispute over an alleged unidentified shipwreck located within 2,500 yards of a point with coordinates 80 degrees, 41.5′ west longitude and 28 degrees, 44′ north latitude. This dispute originated in November 1984, when Plaintiff was exploring the shallow coastal area north of Cape Canaveral, Florida. While diving, Plaintiff found several Spanish coins, covered in green from immersion in salt water, which he believes are part of the remains of a sunken eighteenth century Spanish galleon. These coins were milled in Mexico City, Mexico from 1777 through 1782, and they bore the bust of King Charles III.

Because the coins were all minted in Mexico City within the same time period, Plaintiff postulates that the coins were part of a larger shipment, a mint shipment, which sank before reaching its final destination. Plaintiff hypothesizes that an eighteenth century ship lay submerged in the Cape Canaveral National Seashore and off the coast of Florida for over two hundred years.[1] Believing this to be true, Plaintiff filed a complaint *in rem* in January 1988 seeking ownership of the alleged unidentified vessel or a salvage award for his services. The Court arrested the vessel on January 27, 1988, and appointed Plaintiff as substitute custodian.

After the alleged vessel was arrested, Plaintiff published notice of this *in rem* action in the *Florida Today*, a newspaper of general circulation in Brevard County, Florida on March 10, 1988. No one either responded to this publication or asserted an interest in the alleged vessel. Plaintiff then filed a Motion for Entry of Default which the clerk entered on June 7, 1988.

Shortly thereafter, Plaintiff began to experience problems with the U.S. Park Service for conducting what he thought were legitimate salvage activities. Park rangers arrested Plaintiff's assistants for carrying metal detectors within the Cape Canaveral National Seashore. At that time, the park rangers were not aware that Plaintiff obtained an order arresting the alleged vessel. Thereafter, the charges were dismissed, and Plaintiff was allowed on the premises. For the remainder of the year, Plaintiff conducted very little salvage activities.

In August 1989, Plaintiff began organizing salvage activities. First, he employed James Sinclair, an archaeologist who specializes in historic shipwrecks and President of SAS, Inc., to document the archaeological history of the wreck. Sinclair helped to formulate a research design, produce a map of the wreckage, and verify that the magnetometer readings truly identified an historic shipwreck. Also, Plaintiff hired Shipwrecks, Inc., to assist in a preliminary magnetometer survey and excavation of the alleged vessel.

Salvage operations from August 1989 through September 1989 consisted mainly of magnetometer and remote sensing surveys of

---

1. For centuries, Cape Canaveral, Florida has been known for its numerous navigational hazards. Historical records indicate many ships— possibly in the hundreds—have been lost on the Cape's treacherous shoals.

the alleged vessel. During this time, Cape Canaveral was preparing for a space shuttle launch carrying sensitive Jupiter Probes which required heightened security. Under these circumstances, extensive salvage operations became nearly impossible. Thus, Plaintiff's salvage activities were limited by security concerns and involved additional magnetometer surveys.

The information obtained from these surveys indicated a pattern of magnetic anomalies (or abnormalities beneath the ocean floor) which could be the scattered remains of an historic shipwreck. To confirm this finding, Plaintiff needed to pinpoint selected areas, excavate them, and examine any objects producing the anomalies. Only then would Plaintiff know whether objects causing the anomalies were the remains of an historic shipwreck or some other objects (such as coke cans and other debris). Plaintiff recovered various objects, but none were ancient artifacts or other items belonging to an eighteenth century Spanish galleon. In addition, these objects did not prove the existence of an historical shipwreck.

Salvage activity from October 1989 through December 1989 consisted of additional magnetometer and remote sensing surveys. There were no recoveries. Similarly, salvage activities from January 1990 through March 1990 remained similarly idle, but due to poor weather conditions.

While Plaintiff prepared to resume salvage activities in April, Plaintiff encountered a series of misfortunes. First, the State of Florida required Plaintiff to abide by its regulatory scheme and obtain a permit before conducting salvage operations. Although Plaintiff disagreed with the State's authority to impose its regulations on activity conducted within a federal domain, he applied for a state permit.

Plaintiff applied to the State of Florida Division of Historical Resources. After reviewing Plaintiff's application, James J. Miller, State Archaeologist and Chief of the Bureau of Archaeological Research, informed

him (in a letter dated May 25, 1990) that a salvage contract would be inconsistent with the agreement specifying the land's proper use. Plaintiff's permit was, therefore, denied.

Plaintiff did not apply for a permit with the United States Park Service, but Plaintiff did discuss the matter with Assistant United States Attorney Gregory N. Miller. The United States Government took a similar position regarding salvage activities in the Cape Canaveral National Seashore. Miller opined (in a letter dated May 31, 1990) that the "terms of the dedication prohibit the United States of America from granting Mr. Lathrop permission to conduct salvage operations within the Canaveral National Seashore." Plaintiff's Motion for Preliminary Injunction, Exhibit C. Also, the letter stated that if the Park were used contrary to the dedication's purpose, the reverter clause would terminate the United States' interest, causing the land to revert to the State of Florida. The United States fearing that it would lose an important national park reaffirmed its adherence to park regulations requiring a permit. *See* 36 C.F.R. § 2.1.

One month later, Plaintiff filed a Motion for Preliminary Injunction (the first motion), seeking to invoke this Court's admiralty jurisdiction and to enjoin the United States from interfering with Plaintiff's maritime right of salvage. Plaintiff alleged that imposing a federal requirement to obtain a permit from the United States before conducting salvage activities—primarily excavation—in the Cape Canaveral National Seashore interfered with his right of salvage. The Court conducted a hearing on Plaintiff's Motion on July 23, 1990. The United States filed an *amicus curiae* brief opposing Plaintiff's Motion and appeared at the hearing.[2]

On August 6, 1990, Judge G. Kendall Sharp granted Plaintiff's Motion for a Preliminary Injunction,[3] and enjoined the United States for ninety days from interfering with the Court's continuing *in rem* jurisdiction over the alleged vessel and with Plaintiff's

---

**2.** Counsel for the State of Florida and the United States appeared at the hearing, but did so as non-parties.

**3.** The issue raised in that previous injunction by the United States was *ownership* of the alleged shipwreck.

ongoing salvage operations. In granting that injunction, the Court determined that the United States did not have "constructive possession" which would establish its claim of ownership and thereby defeat Plaintiff's claim. Moreover, the Court held that general admiralty law principles award ownership to a salvor or finder who locates abandoned property and then exercises dominion and control over the found property. According to the Court, applying an "embeddedness" theory would conflict with admiralty law. Therefore, federal statutes could not be construed to displace general admiralty law because those statutes conflict with established maritime principles. The Court did not address the State's claim of title.

With the injunction firmly in place, Plaintiff resumed salvage operations. Plaintiff had contracted with Cobb Coin Company, Inc. ("Cobb"), and its Operations Manager, John Brandon, to help salvage the vessel. During August 1990, Cobb conducted a preliminary magnetometer survey twenty-two miles south of Ponce de Leon Inlet. The objective of this survey was to determine the presence of ferrous or other objects within the area thought to contain a sunken shipwreck.

A seven person crew led by Kim Fisher, Captain and Vice President of Cobb, was dispatched to the alleged vessel site. This crew conducted preliminary magnetometer surveys. The crew's analysis of the preliminary survey led them to conclude that no identifiable correlation existed between the anomalies. The area, which Plaintiff believed to contain an historic shipwreck, instead, could be a natural trap for metallic debris washed in from the sea. Without acquiring additional knowledge of the depth of the sand and shell overburden covering the bedrock, it was impossible to calculate the size of the objects producing the magnetic fluctuations or anomalies.

After the surveys were completed, Plaintiff began excavating selected areas in search of the alleged vessel. Cobb's crew would anchor the boat and utilize the boat's prop-wash deflectors to steer prop-wash into ocean floor and excavate a pinpoint area.

Although this was an effective technique, it created large craters in the soil. These craters were examined carefully for clues that may prove the existence of a shipwrecked vessel; and should the vessel's remains be found, Plaintiff could then determine its size and location. While Plaintiff vigorously pursued the alleged vessel, his salvage activities created large craters that were damaging the Cape Canaveral National Seashore.

After Plaintiff had resumed salvage activities, and two days after Judge G. Kendall Sharp issued the preliminary injunction, the State of Florida filed a separate action in state court. In that complaint, the State of Florida sought to protect Cape Canaveral National Seashore's submerged lands from damage, trespass or unlawful use. Under Florida law, it is a violation to use state-owned lands to dredge, or to excavate and remove historic artifacts without a permit. Counsel for Florida requested a temporary restraining order to protect its claim of tile and ownership to the alleged vessel embedded in submerged lands located within its territorial waters. *See* Fla.Stat.Ann. § 267.-061 (1990). The State of Florida sought an order prohibiting Plaintiff from dredging or excavating until title could be adjudicated.

Plaintiff removed that state action to federal court on August 13, 1990, and the two cases were subsequently consolidated. Plaintiff then renewed his earlier motion for Preliminary Injunction to include the State of Florida and its agencies. The Court granted that motion, and enjoined the State of Florida from interfering with Plaintiff's ongoing salvage operations. Thereafter, the State filed a Motion to Remand the newly removed action, arguing that the Eleventh Amendment barred such a suit. The Court denied the State's motion.[4]

On October 22, 1990, Plaintiff filed a Motion to Modify the Preliminary Injunction. Plaintiff requested that the injunction remain in effect beyond the original expiration date and until October 1, 1991. Plaintiff requested this extension because he was unable to conduct salvage operations when the injunction was first issued in August 1990. One

---

**4.** *See infra* note 9 and text accompanying note.

reason for his inability to conduct salvage activities during this period was the meteorological conditions. Another reason was the earlier delay caused by the State of Florida. The Court denied the motion on January 11, 1991, because the 1990 salvage season had ended.

For the next six months, Plaintiff did not conduct any salvage operations. Plaintiff refrained from conducting salvage activities because the State of Florida was processing Plaintiff's application to excavate. Eric J. Taylor, an Assistant Attorney General, notified Plaintiff in December 1990 that the Florida Department of State had approved a settlement, in principle, authorizing Plaintiff to conduct salvage activities. There were two reservations: He declared that additional time was necessary to obtain final approval and prepare a written agreement. After receiving approval from Florida, Plaintiff would be required to obtain permission from the United States.

Although Plaintiff edged closer to obtaining the State's permission, a new problem emerged shortly before the 1991 salvage season began. As regulator of the Cape Canaveral National Seashore, the United States asserted its paramount role in protecting the land from further excavation. William A. Baxter, Assistant District Counsel for the Corps of Engineers, informed Plaintiff's Counsel on July 8, 1991, that the Court's admiralty jurisdiction would not preclude the United States from regulating salvage activities that occurred within their dredge-and-fill jurisdiction. Counsel for the Corps of Engineers urged that it had jurisdiction over dredging activities occurring in tidal water that extended from the mean high water line to the outer limits of the continental shelf. The Corps of Engineers did not recognize the Preliminary Injunction as affecting its jurisdiction.

Although the United States insisted that Plaintiff obtain a federal permit before resuming salvage activities, Plaintiff began operations without the Corps' approval. On September 9, 1991, Counsel for the United States, Caroline M. Zander, notified Plaintiff's Counsel that the Chief Ranger of the Canaveral National Seashore had seen a plume coming from an area where Plaintiff's ships were anchored. The presence of a plume indicated dredging, and Zander urged that Plaintiff's salvage activities were unlawful in the Cape Canaveral National Seashore without first obtaining a permit from the Army Corps of Engineers.[5]

A week later the Army Corps of Engineers issued a cease and desist order. In that order, the Corps of Engineers stated that Plaintiff must comply with the Rivers and Harbors Act before dredging in navigable waters of the United States. If Plaintiff failed to comply, the Corps of Engineers would seek legal action.

While the Corps of Engineers was asserting its jurisdiction and ordering Plaintiff to cease and desist salvage activities, there was some confusion between the United States and the State of Florida concerning each sovereign's regulatory responsibilities. To clarify each sovereign's role, Robert M. Baker, National Director of the U.S. Park Service, wrote Secretary Smith concerning his views on the problem. In a letter dated September 20, 1991, Secretary Smith, who is a member of the Board of Trustees with review authority over Plaintiff's application, responded to Baker's assertion that the dedication vested in the United States administrative and regulatory authority over the Cape Canaveral National Seashore:

> I agree with your legal analysis concluding that the State's interest in the subject land is *subordinate* to the interest conveyed to the United States by the dedication instrument of April 1, 1980, wherein the Board of Trustees conveyed exclusive use of the lands to the United States for 'wilderness/preservation purposes' and the administration of said lands as part of the Canaveral National Seashore ... In view of the rights already conveyed to the federal government, I agree that it would be inappropriate for the Department of State to issue a contract to conduct salvage within Can-

---

**5.** The United States took the position that Plaintiff must comply with the Rivers and Harbors Act

of 1899 (codified at 33 U.S.C. § 403).

averal National Seashore, and no such permission will be given.

United States Opposition to Plaintiff's Motion for Preliminary Injunction, Exhibit C (emphasis added). Secretary Smith agreed that through the dedication the United States' regulatory interest became paramount.[6]

The Court held a status conference addressing this problem on September 27, 1991. All parties were represented at the hearing. After the hearing, the Magistrate Judge issued an Order requiring the United States, a non-party to the litigation, to file a separate action requiring Plaintiff to comply with the permitting process which would be consolidated with the pending cases.

The United States never filed a separate action. During this time, the parties conducted settlement negotiations, and Plaintiff agreed to comply with the permitting procedures. From these negotiations, Plaintiff agreed, therefore, to cease all dredging and salvaging activities within the boundaries of the Canaveral National Seashore, including the use of a metal detector or magnetometer. Plaintiff refrained from any further salvage activities for the remainder of 1991, awaiting a response from the State of Florida and the Army Corps of Engineers on his permits.

By January 1992, Plaintiff had made little, if any, progress on obtaining the State of Florida's consent to use state-owned submerged lands.[7] Likewise, the Army Corps of Engineers notified Plaintiff on March 5, 1992, that it had denied his permit (1991–01016(IP–eb)) because the State of Florida Department of Environment Regulation had denied a similar request. On February 24, 1992, Plaintiff filed a Second Motion for Preliminary and Permanent Injunction, which is presently pending before the Court.[8] The State of Florida has filed no response to the request for an injunction.[9] On April 6, 1992, the United States of America filed an *amicus curiae* brief in opposition to Plaintiff's request for an injunction. The Court conducted a hearing on Plaintiff's request for an injunction on May 14, 1992.

This controversy presents two complex issues involving principles of jurisdiction, federalism and comity, and Congress' power to alter substantive admiralty law, namely: (1) whether the Court has *in personam* jurisdiction to issue an injunction against the United States and its agents where the United States is not a party to this litigation and has not been served with process and (2) whether Congress can constitutionally supplement substantive admiralty law by regulating salvage activities; and if so, whether the United States can require a potential salvor of an alleged historical shipwreck to comply with federal law requiring a permit before conducting salvage activities in a national park.

## II

## IN PERSONAM JURISDICTION

It is important to clarify the United States' status in this litigation. Plaintiff commenced an *in rem* action to arrest only the alleged vessel. As an *in rem* action, the only party brought before the Court is the alleged unidentified vessel. The United States appears in this matter as an *amicus curiae*.[10] In this capacity, the United States has filed only a brief in response to Plaintiff's motion for an injunction. Plaintiff has not,

6. *See infra* note 21.

7. There remains confusion over ownership of the submerged lands. The State of Florida maintains that the dedication did not convey title to the submerged lands. Thus, the State of Florida asserts ownership over the alleged wreck, presumably leaving the United States with exclusive authority to manage the Cape Canaveral National Seashore.

8. This case was reassigned to the undersigned on January 2, 1992.

9. The State of Florida is not a party to the *in rem* action, but argues that its removed action is an

*in personam* action to adjudicate title to the alleged vessel binding only the State of Florida and Plaintiff. The State claims that the Eleventh Amendment bars this Court from adjudicating its interest in the vessel since it has not waived sovereign immunity.

10. Although there is no precise rule in the Federal Rules of Civil Procedure governing *amicus curiae*, it is generally accepted that it is within the Court's "inherent authority" to appoint "friends of the court." *Resort Timeshare Resales, Inc.*, 764 F.Supp. at 1501.

however, endeavored to join the United States as a party. Nor has Plaintiff served the United States with process.

 Although this action began as an *in rem* admiralty action, the issuance of an injunction operates *in personam* and requires the same jurisdictional predicate as any other *in personam* action—a basis for exercising personal jurisdiction accompanied by adequate notice (service of a summons and a complaint). *Hitchman Coal & Coke Co. v. Mitchell,* 245 U.S. 229, 38 S.Ct. 65, 62 L.Ed. 260 (1917). A federal court may issue an injunction if it has personal jurisdiction over the parties and subject matter jurisdiction over the claim. *Zepeda v. United States I.N.S.,* 753 F.2d 719 (9th Cir.1983); *Bethell v. Peace,* 441 F.2d 495 (5th Cir.1971); *see generally* 11 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2941 (1990) (stating that "the Court must have personal jurisdiction over the party against whom equitable relief is sought").

 As an *amicus curiae,* the United States is not a party to this action, but participates solely for the benefit of the court. *Resort Timeshare Resales, Inc. v. Stuart,* 764 F.Supp. 1495, 1501 (S.D.Fla. 1991). Because the United States is not already a *party* over which the Court has acquired *in personam* jurisdiction, Plaintiff then was required to serve process on the United States and to provide proof of such service to the Court. Fed.R.Civ.P. 4(j), 65. If the United States has been properly served, the file lacks such *timely* proof.[11] Without jurisdiction, the Court lacks the *power* to enjoin the United States.

### III

### PRELIMINARY INJUNCTION

Although the Court has determined that it lacks *in personam* jurisdiction over the United States, and therefore is without authority to enjoin it, the Court will address the merits of Plaintiff's motion in the event the United States has been properly served.

In order for the Court to issue an injunction, a Plaintiff must establish four essential elements: (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat that Plaintiff will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to Plaintiff outweighs the threatened harm; and (4) that granting the preliminary injunction will not disserve the public interest. *Jupiter Wreck, Inc. v. Unidentified Sailing Vessel,* 691 F.Supp. 1377, 1383 (S.D.Fla.1988). *Canal Authority of the State of Florida v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974).

### A

### SUBSTANTIAL LIKELIHOOD OF SUCCESS

 Plaintiff presents two claims in this *in rem* action: (1) a right of salvage and (2) ownership of the vessel. Distinguished from the law of finds, the law of maritime salvage is concerned not with title to the property, but rather with successful recovery and possession of lost property from the oceans and waterways. *See MDM Salvage v. Unidentified W & A Sail Vessel,* 631 F.Supp. 308, 312 (S.D.Fla.1986). Salvage involves the right to possess another's property and to save it from destruction, danger or loss, allowing a salvor to retain it until being compensated by the owner. *Id.* Once in possession, no other person can lawfully intrude upon that possession, including the salved vessel's master or owner. 3A M. Norris, *Benedict on Admiralty: The Law of Salvage* § 151 (7th ed. 1983).

### 1.

### SALVAGE CLAIM

 In order to establish a claim for salvage, three elements must be proven: (1) a

---

11. In the United States' original response filed in July 1990, the United States argued against the sufficiency of service of process; namely, that Plaintiff failed to comply with Rule 4(d)(4) which requires personal service on the United States Attorney and a copy of both the complaint and summons mailed to the Attorney General and the representative agency.

In response to the second request for an injunction, the United States objects to the issuance of an injunction, but asserts that it is not a "party." The Court interprets this argument as a renewal of the previous objection—that the Court lacks *in personam* jurisdiction over the United States.

"marine peril"; (2) service voluntarily rendered; and (3) success—either wholly or partly—in recovering the imperiled property. *Id.* The alleged historic shipwreck is in marine peril, *Treasure Salvors, Inc. v. Wrecked and Abandoned Sailing Vessel,* 569 F.2d 330 (5th Cir.1978), *aff'd in part and rev'd in part, on other grounds, sub nom. Florida Dep't of State v. Treasure Salvors, Inc.,* 458 U.S. 670, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982). *But see Klein v. Wrecked and Abandoned Sailing Vessel,* 758 F.2d 1511, 1515 (11th Cir.1985) (stating that vessel was not lost or suffering any marine peril), and Plaintiff has voluntarily rendered his services to rescue its remains. Plaintiff has been only slightly successful in recovering its remains. To date, he has recovered approximately eight silver coins and a nail.

▪ Although Plaintiff has established these elements of salvage (the last element in part), this case presents an additional problem: The vessel is located in a national park, and the State of Florida conveyed exclusive use of those lands to the United States for a single purpose—to preserve and protect the wildlife. As the protector of the Cape Canaveral National Seashore, the United States requires Plaintiff to obtain a permit before *lawfully* excavating the alleged vessel.[12] Simply put, the United States argues that several Congressional enactments have modified the *substantive law* of admiralty. By these enactments—the Rivers and Harbors Act, the Antiquities Act, and several U.S. Park Service Regulations[13]—Congress has restricted the *manner* in which a potential salvor can excavate abandoned shipwrecks located on federal lands. According to the United States, these enactments restricting Plaintiff's manner of salvaging the alleged shipwreck do not conflict with the underlying principles of salvage; namely, that the law of

salvage was developed to offer economic incentives to seamen observing cargo in immediate marine peril to undertake rescue efforts. *Zych v. Wrecked and Abandoned Vessel,* 941 F.2d 525, 531 (7th Cir.1991). The Court agrees.

▪ The Constitution has extended the judicial power to all cases of admiralty and maritime jurisdiction. *See* U.S. Const. Art. III, § 2. Congress has implemented statutorily the Constitutional grant of jurisdiction and made it exclusive. *See* 28 U.S.C. § 1333. Courts have held that Congress may constitutionally "alter, qualify, or supplement the substantive admiralty law [presumed to be in existence at the writing of the Constitution]." *Panama R.R. Co. v. Johnson,* 264 U.S. 375, 386, 44 S.Ct. 391, 393, 68 L.Ed. 748 (1924) (alteration in original). There are limits, though, to Congressional power to supplement or alter admiralty law. The Supreme Court noted these limitations:

> One is that there are boundaries to the maritime law and admiralty jurisdiction which inhere in those subjects and cannot be altered by legislation, as by excluding a thing falling clearly within them or including a thing falling clearly without. Another is that the spirit and purpose of the constitutional provision require that these enactment ... shall be co-extensive with and operate uniformly in the whole of the United States.

*Id.* at 386–87, 44 S.Ct. at 394.[14]

▪ Congressional enactments restricting the *manner* in which a potential salvor excavates property located on federally owned or managed lands does not offend these sound constitutional limitations. The State of Florida dedicated the Cape Canaveral National Seashore to the United States for a specific purpose which is "to preserve

---

**12.** Unlike *Jupiter Wreck, Inc. v. Abandoned Sailing Vessel,* 691 F.Supp 1377 (S.D.Fla.1988), in which a salvor sought an injunction against state officials, Plaintiff seeks an injunction against the *United States* because the United States Park Rangers have threatened to arrest Plaintiff if he attempts further excavation in the Cape Canaveral National Seashore's seabed.

**13.** The Abandoned Shipwreck Act of 1987, (codified at 43 U.S.C. §§ 2102(a), 2105(a)(1)), does

not apply. It only applies to actions brought prior to April 28, 1988.

**14.** The Supreme Court has implied that the uniformity doctrine is only "properly invoked to strike down state legislation when it purports to regulate commercial navigation." *Zych,* 941 F.2d at 533 n. 11. (construing *Askew v. American Waterways Operators, Inc.,* 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973)).

and protect the outstanding natural, scenic, scientific, ecologic, and historic values of certain lands, shoreline, and waters of the State of Florida, and to provide for public outdoor recreation use and enjoyment of the [park]." 16 U.S.C. § 459j. The dedication contains a reverter clause allowing the State of Florida to reenter and reclaim possession if the land is used for an improper purpose.[15] To prevent against the land's reversion, Congress has enacted legislation allowing the Secretary to terminate a right of use and occupancy retained by an owner of improved property in the park if the land is being used in a *manner inconsistent* with its specified *purpose. See* 16 U.S.C. § 459j–2(b).

■ In order to protect national parks, such as the Cape Canaveral National Seashore from being endangered, Congress has passed various laws which prohibit the appropriation of historic artifacts,[16] or excavation [17] on federal lands without first obtaining a permit from the Corps of Engineers. The permitting process is comprehensive, but it considers the effects of the proposed activity on the public interest as well as the effect on the environment, wildlife, and historical and cultural resources. 33 C.F.R. § 320.4. *See Zable v. Tabb,* 430 F.2d 199 (5th Cir.1970), *cert. denied,* 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971). Such laws, however, do not deprive a federal court of admiralty jurisdiction. Nor do they necessarily prohibit a potential salvor from conducting salvage activities, although they might. Rather, these statutes supplement admiralty law by providing substantive rules for *lawfully* conducting salvage operations on federally owned or managed lands.

■ The requirement that a salvor act lawfully while salvaging a vessel is consistent with general admiralty law. By itself, possession of abandoned property is not sufficient to establish a salvage claim. *Martha's*

*Vineyard Scuba HQ. v. Wrecked and Abandoned Steam Vessel,* 833 F.2d 1059 (1st Cir. 1987). Before a valid claim can be established, a salvor must acquire possession *lawfully.* Otherwise, as one court noted, "buccaneering would again flourish on the high seas." *Id.* It is for Congress—through appropriate legislation—to substantively supplement admiralty law and determine the lawfulness of certain salvage activities.

■ In instances such as the case at bar, restrictions are necessary. Without any restrictions, Plaintiff's salvage activities could not only destroy the alleged vessel and its historic artifacts, but also could disrupt the delicate marine life living on the seabed. An example illustrates the need for such restrictions. Salvors could conceivably block an international shipping route by anchoring a salvage vessel in the channel while attempting to rescue a sunken shipwreck. *See id.* at 1067. Certainly, the United States Coast Guard could exercise its jurisdiction and prevent placement of salvage vessels that would interrupt the flow of maritime traffic. Although this restriction would interfere with salvage activities, it is a necessary restriction to ensure the safety of both salvors and the public. Legislation which supplements admiralty jurisdiction by imposing necessary restrictions on salvage activities is an important legislative function properly reserved to Congress.[18]

In sum, it appears to the Court that Plaintiff would not prevail on a salvage claim because he cannot lawfully gain possession of the alleged vessel without first obtaining a permit from the United States. The United States Congress has the legislative power to regulate a national park such as the Cape Canaveral National Seashore, even though the State of Florida may retain ownership of the submerged lands. Thus, Plaintiff must

---

**15.** The reverter clause states: "Should the United States of America cease for any reason, to use these lands for the herein stated purposes, title to said lands shall revert to said Board of Trustees." United States' Amicus Curiae Opposition, Defendant's Exhibit A, at 2, ¶ 2.

**16.** Antiquities Act of 1906, (codified at 16 U.S.C. § 433).

**17.** Rivers and Harbors Act of 1899, (codified at 33 U.S.C. § 403).

**18.** The Eleventh Circuit has recognized Congress' broad powers over "all public lands pursuant to the Property Clause of the United States Constitution." *Klein, supra,* at 1514 (construing *Kleppe v. New Mexico,* 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976)).

comply with the permitting process. When Plaintiff obtains a permit, Plaintiff's salvage activities and recovery of artifacts will be deemed lawful. The Court concludes, therefore, that Plaintiff has failed to demonstrate a substantial likelihood of prevailing on his salvage claim.

There is another aspect of salvage law that further demonstrates Plaintiff cannot establish a substantial likelihood of prevailing on the merits. Potential salvors do not have an inherent right to save distressed vessels. *Jupiter Wreck*, 691 F.Supp. at 1377. Instead, a salvage award may be denied if a salvor forces its services on a vessel despite rejection by the owner or by a person with authority. *Platoro Ltd., Inc. v. Unidentified Remains*, 695 F.2d 893 (5th Cir.1983) (construing *The Indian*, 159 F. 20, 25 (5th Cir. 1908)). The doctrine of rejection normally applies when the master of a distressed vessel directly and unequivocally rejects a salvor's services. In cases where the vessel has sunk, the master can communicate rejection of salvage services through a sign, buoy, marker or public advertisement. When the master does so, a salvor who continues efforts to rescue the vessel will not be entitled to a salvage award.

There exists a similarly related doctrine—constructive rejection—which would allow a *state* [19] to reject a salvor's services. *See Platoro*, 695 F.2d at 902. The constructive rejection of salvage services bars an award if the rejection was reasonably understood by a salvor. In this context, the United States must demonstrate that various federal laws put Plaintiff on notice that his services have been rejected. This doctrine then requires a fact finder to determine Plaintiff's understanding of relevant federal laws.

Typically, a salvor acts as an agent for a vessel's owner. A salvor acquires the right to possess an abandoned shipwreck, but he does not acquire title. Title remains with the owner as does the right to refuse salvage. Yet in cases involving an historic shipwreck, it may be unclear to a salvor who the owner actually is.[20] If a salvor does not know whether it is the United States or the State of Florida which has a valid claim of ownership, a salvor will not know which sovereign's laws apply. This assumes, of course, that whichever law applies, it provides a clear statement rejecting salvage services.

At this stage, the Court must determine whether Plaintiff has demonstrated a substantial likelihood of prevailing on the merits of his salvage claim. For the reasons that follow, the Court concludes Plaintiff has not demonstrated a substantial likelihood of prevailing. In this case, Plaintiff knew the alleged vessel was located on land owned by the State of Florida and dedicated to the United States for preservation as a national

**19.** States not only have laid claim to ownership of wrecked property located within their territorial waters, but also have attempted to preclude salvage activities by potential salvors. These claims have been viewed by salvors as state interference in an area which is predominantly controlled by Federal law, and which is "essentially a Federal problem." M. Norris, *Benedict on Admiralty, supra,* at 11–14.

**20.** The Eleventh Circuit applies the law of finds in determining ownership of an abandoned vessel. *Klein,* 758 F.2d at 1513. *See also Treasure Salvors,* 569 F.2d at 337 n. 11 (stating that "the primary difference between the two doctrines is that under the law of salvage the claim of the finder of abandoned property is satisfied by proceeds from the sale of the property paid into court"). According to the law of finds, title vests in the person who reduces the property to his or her possession. *Id.*

There are two exceptions to the law of finds. When the abandoned property is embedded in the soil, it belongs to the soil's owner. Second, the law considers the owner of the land who has "constructive possession" of the property to have never lost the property. If either exception applies, a salvor cannot prevail on his or her claim of ownership. *See Zych,* 941 F.2d at 530 n. 7 ("Embeddedness" [ ] is to be 'consistent with the recognized exception from the law of finds for shipwrecks embedded in the submerged lands of a state.").

Although ownership of the alleged vessel is an unresolved question, a salvor who knows that a shipwreck is submerged on federal or state lands also should know that a State has a colorable claim of ownership. As such, a salvor should investigate the State's laws to see if the sovereign has rejected salvage services. Here, Plaintiff should have examined either Florida law (if the State has retained ownership of the submerged lands), or federal law. Under *Klein,* an owner can refuse salvage services.

park. It is unquestioned that the State of Florida has, by virtue of its police powers, the right to regulate the use of its land and to refuse salvage services when those services will endanger its natural and historical resources.

■ Because the State of Florida dedicated its land to the United States to establish a national park, the United States has the authority to manage and protect the land, its marine life, and historic artifacts from damage caused by dredging or excavating.[21] Thus, Plaintiff should have known that the State of Florida, the presumed owner of the submerged lands and any property embedded in the soil, might refuse Plaintiff's offer to excavate the alleged vessel.

While this Court does not decide the ownership of the alleged shipwreck, the Court concludes that it is likely that Plaintiff must have reasonably known that the State of Florida—the alleged vessel's likely owner, rejected his offer of salvage services. *Jupiter Wreck, Inc. v. Abandoned Sailing Vessel,* 691 F.Supp. 1377 (S.D.Fla.1988) (denying injunctive relief because the court concluded that the State of Florida was not required to allow the property salved, and the State's statutory scheme reflected the owner's rejection of salvage services). The Court concludes that Plaintiff has not demonstrated a substantial likelihood of prevailing on the merits of his salvage claim.

**2.**

**OWNERSHIP CLAIM**

**SUBSTANTIAL LIKELIHOOD OF SUCCESS**

■ In determining the ownership of a shipwreck, the Court applies the common law of finds.[22] A find in maritime law assumes that the property is abandoned and has returned to the state of nature. M. Norris, *supra* at 11–16. This principle then assigns ownership of the abandoned property to the first person to reduce such property to "possession." *Id.* This may be either actual or constructive. There are two exceptions to the general rule. First, when abandoned property is embedded in the soil, it belongs to the owner of the soil. *Klein,* 758 F.2d at 1514. Second, when the owner of the land has "constructive possession" of the property, it is not "lost," but rather belongs to the land's owner. *Id.*

■ In the instant case, the alleged shipwreck is buried in the soil. The soil belongs to either the United States as part of its national park system which was dedicated to it by the State of Florida or to the State of Florida. It appears, then, that if the United States acquired title to the submerged lands from Florida, it also acquired title to the alleged shipwreck embedded beneath the soil.[23] If the State of Florida retained own-

**21.** There remains to be resolved a question regarding the United States' authority to regulate the submerged lands. Because the State of Florida alleges that it retained ownership of the submerged lands, it is unclear whether the *dedication* allows the United States to exercise sole regulatory authority over the Cape Canaveral National Seashore, including the submerged lands. The Court does not decide this question, but proceeds under the assumption that State of Florida retained ownership of the submerged lands, and that the dedication allows the United States to regulate the submerged lands.

**22.** This doctrine developed at common law, but is considered a maritime concept. *Zych,* 941 F.2d at 532 (stating that Congress "seems to have assumed that the law of finds was indeed an aspect of admiralty law"). *See also Klein,* 758 F.2d at 1514.

**23.** The Court notes that the United States does not have to intervene to defeat Plaintiff's claim of ownership. As an *amicus curiae,* the Court can

consider the United States' contention that someone other than Plaintiff has a better claim of title. In addition, the question of ownership does not entirely dispose of the matter. Even though the United States may not own the submerged lands, the State of Florida may have relinquished its regulatory authority over the submerged lands. Even without the States' consent, Congress has the legislative power to preempt state law by supplementing admiralty jurisdiction and determining the manner in which a salvor can *lawfully* possess an abandoned shipwreck in the navigable waters of the United States. *Klein,* 758 F.2d at 1515 (Kravitch, J., dissenting). *See* the Rivers and Harbors Act of 1899 (codified at 33 U.S.C. § 433 (Supp.1991)). The State's alleged ownership of the submerged lands alone then is not a basis for disproving the United States' authority to regulate its use.

Likewise, should the State of Florida retain ownership of the submerged lands, Plaintiff probably would not prevail under the exception to the law of finds announced in *Klein.* Accord-

ership of the submerged lands, it has possession and title of the alleged shipwreck. Therefore, Plaintiff has not demonstrated a substantial likelihood of prevailing on his claim of ownership to the alleged shipwreck.

## B

### PLAINTIFF'S IRREPARABLE INJURY

The question of Plaintiff's irreparable injury is inextricably intertwined with the question of ownership and the right to refuse salvage. If the United States is declared owner and has refused Plaintiff's salvage services, Plaintiff has suffered no irreparable injury. Plaintiff alleges, however, that if the injunction is not granted, he will lose his right to pursue a salvage claim, and his employees will face arrest, and criminal and civil penalties. If Plaintiff prevails then on its claim of ownership or salvage, Plaintiff will be entitled to either take possession of the vessel [24] or receive a salvage award for his services. If he does not prevail, the harm Plaintiff alleges is purely theoretical.

## C

### BALANCING OF THE HARM

■ For the reasons that follow, any harm to the public and the United States would outweigh any harm suffered by Plaintiff if the injunction were granted. At stake is the continued preservation of a national park dedicated by the State of Florida. As the dedication itself states, these lands are dedicated to preserve the waters of the State of Florida for the public's outdoor recreational use. The public's use and enjoyment is

deeply rooted in the preservation of the seashore's natural, scenic, scientific, ecologic, and *historic* value.[25] Because the dedication includes a reverter clause, the land could revert to the State of Florida if the injunction were granted. The consequences of that reversion would be severe indeed.

The United States and its citizens would lose a national park of unparalleled beauty and historical significance. Americans have always possessed a deep affection for America's national parks and its environment. The United States establishes national parks primarily to protect precious lands from being damaged and to promote the well-being of marine life by preserving its habitat. Yet national parks serve another important function—their creation allows citizens to enjoy the beauty, peacefulness and uninterrupted solitude of the outdoors.

Cape Canaveral is a popular tourist attraction which is visited by thousands annually, and the National Seashore adds to the magnificence and enchantment of this well-known attraction. Similar to the environment, Americans have held a deep affection for the space program. To many, it personifies America's love for freedom, science, and adventure. As representative of those ideals, Cape Canaveral has become a well-endowed sanctuary for those who journey to Florida to watch shuttle launches or to visit the space museum. Presumably, the State of Florida dedicated this land to the United States because it would be in a better position financially to maintain the park and its shores. By granting this injunction, it appears with

---

ing to *Klein,* Plaintiff may have been the first to find the alleged shipwreck, but the abandoned property belongs to the owner of the soil. *A fortiori,* the sovereign owner can refuse salvage services.

**24.** This assumes of course that Plaintiff files for and receives a permit. A question that may *conceivably arise is whether the United States* could impose its regulatory scheme on Plaintiff should Plaintiff prevail as owner of the alleged wreck. Plaintiff's present status is that of a potential salvor. The Court finds that the United States may, consistent with admiralty principles, impose regulations on a potential salvor, but does not decide the *extent* of its regulatory authority.

**25.** The United States included two affidavits in support of its motion. Affiant Tyrell A. Henwood, Ph.D., a Fishery Biologist employed by the United States Department of Commerce, stated that Plaintiff's salvage operations increase the turbidity and alteration of nearshore bottom characteristics that could adversely affect turtles. Affidavit of Tyrell A. Henwood at 2.

Larry Murphy, an Archeologist with the Submerged Cultural Resources Unit, a division of the United States Department of Interior, asserts that Plaintiff's salvage activities are contrary to standard archeological procedures and unnecessarily endanger any artifacts that might exist. Affidavit of Larry Murphy at 3.

certainty that the land comprising the national park could revert to the State of Florida, and the future of this national park would be greatly jeopardized.

## D

## DISSERVICE TO THE PUBLIC

The last requirement that must be satisfied is that by granting an injunction the public interest would not be disserved. In this case, Plaintiff's continued efforts to excavate the alleged shipwreck would disserve the public by bringing about two severe consequences: (1) the Cape Canaveral National Seashore would *revert* to the State of Florida, and (2) the marine life and artifacts would be damaged.[26] Many of the issues in this case depend on resolution of a critical question—ownership of the alleged vessel. Essentially, the resolution of this entire matter requires the presentation of evidence during trial. Until the Court has an opportunity to adjudicate title [27] to the shipwreck, the Court finds that the best way to adequately protect the rights of the salvor and the public is by denying the injunction.

Clearly, there are two important interests to be preserved: the right to salvage and the preservation of a national park. On the one hand, Plaintiff asserts that his maritime right of salvage has been impeded. The United States asserts that it will lose the Cape Canaveral National Seashore if Plaintiff prevails. During trial, it is clear that both parties cannot prevail on their claims. For this reason—both parties cannot prevail on their claims—an injunction is an extraordinary remedy which should not granted unless Plaintiff can establish a substantial likelihood of prevailing on the merits of his claims. Plaintiff has failed to meet his burden.

Because it is unclear that during trial Plaintiff could establish either entitlement to a salvage award or ownership of the alleged vessel, an injunction is not a proper remedy.

If the Court granted an injunction improvidently, the United States could lose the Cape Canaveral National Seashore. The reason for this austere result is the dedication agreement's reverter provision. The purpose of having a reverter clause, such as the one in the dedication, is to ensure usage consistent with a specified purpose. Here, the purpose advocated by the United States is the land's preservation. Should the land be used for other purposes that endanger its preservation, the State of Florida then can reenter, oust the United States of any ownership interest, and reclaim the land. If this were to occur, the United States and its citizens would lose an important national park. Moreover, the future of the park's land, its artifacts, and its marine life also would be jeopardized. The Court concludes that Plaintiff cannot meet his burden on this element because an injunction would disserve the public.

Accordingly, it is **ORDERED AND ADJUDGED** that Plaintiff's Motion for Preliminary Injunction (Doc. No. 66) is **DENIED**.

**DONE AND ORDERED.**

---

26. *See supra* note 25 and text accompanying note.

27. The State of Florida contends that title to the alleged vessel must be adjudicated in state court. *See supra* note 9. Shortly after removal, the state filed a Motion to Remand which was denied on

August 22, 1990. Before ruling on Removed Plaintiff's Motion for Summary Judgment, the Court may wish to reconsider the State's request for remand in order to decide the alleged vessel's ownership.