SPRECKELS *et al. v.* THE STATE OF CALIFORNIA, (PACIFIC COAST S. S. Co., Intervenor.)

*(District Court, N. D. California.* December 22, 1890.)

SALVAGE—CONTRACT FOR COMPENSATION.
   The owners of a certain vessel, on receiving a dispatch that she was disabled, engaged a tug of libelants to proceed to her relief for a stipulated compensation. They afterwards agreed to employ another tug of libelants for the same purpose, and at an agreed price, in case a dispatch should be received showing the vessel's position to be different from that supposed when the first tug started. Such a dispatch was not received, but the owners employed a tug of others than libelants to proceed after the vessel. Libelants then sent their second tug, which brought in the vessel. The owners, when informed that such tug had gone, made no protest. *Held,* that libelants were entitled to the stipulated amount, but not to other salvage compensation.

In Admiralty.
*Milton Andros* and *Chas. Page,* for libelants.
*Geo. W. Towle, Jr.,* for claimants.

HOFFMAN, J. On the afternoon of January 3, 1890, Messrs. Goodall & Perkins received a telegraphic dispatch from the first officer of the steamer State of California, dated "Bowen's Landing, via Walhalla," informing them that the steamer had broken her shaft, that her rudder was disabled, and that assistance was required to tow her into port. The steamer was then three days overdue, and her non-arrival had given rise to serious apprehensions for her safety. Her value, with her cargo and freight, was about $300,000. She also had on board 130 passengers. On receiving this dispatch, Ex-Gov. Perkins immediately opened negotions with Mr. J. D. Spreckels, representing the libelants, who are the owners of five powerful and well-equipped tugs, for the dispatch of one of them to the assistance of the disabled vessel. A written contract was

executed, under which the Vigilant was at once sent out to perform the service at a stipulated rate *per diem* to be paid at all events, and irrespective of the failure or success of her mission. Shortly after her departure Mr. Spreckels suggested to Mr. Perkins that, on comparing the longitude of the position of the disabled vessel with the time consumed by the mate in reaching the shore, he was satisfied that the longitude was incorrectly stated in the dispatch; and that if, as he suspected, the vessel's true position was much further to the eastward, a second tug should be sent to seek for the steamer in her corrected position. In this suggestion Mr. Perkins at once acquiesced. A dispatch was sent to the mate, and an agreement made with Mr. Spreckels that the Relief should be put in readiness to start if the mate should reply that the position of the steamer was erroneously stated in his first dispatch. The parties also came to an understanding as to the compensation to be paid to the Relief if its services should be required. The mate's reply was momently expected; and it was arranged that Capt. Hawley of the Relief should call at 5 o'clock at the office of Mr. Perkins, and receive from him an order for the expected dispatch, if, in the mean time, it had not arrived. Later in the afternoon Mr. Perkins was called upon by Capt. Gray and Capt. Griffith, representing the Merchants' & Ship-Owners' Tug-Boat Company. They appear to have objected with some warmth to his employment of a boat of a rival line, and Mr. Perkins was induced, or, perhaps, felt himself obliged, to enter into a contract with them for the dispatch of the Monarch in quest of the disabled steamer. Some doubts of Ex-Gov. Perkins' good faith in this transaction seem to be entertained by the advocate for the libelants. But I see no sufficient reason to impute to Ex-Gov. Perkins an intention to induce the libelants to make preparations for the dispatch of the Relief at a moment's notice, if the mate's expected dispatch had shown the steamer much nearer shore than at first reported, when, in point of fact, he did not intend to dispatch her in any event. As already stated, the steamer, with cargo and freight, was worth some $300,-000. She had on board 130 passengers. Motives of interest and of humanity suggested the necessity of omitting no measures to secure her safety. If the mate's expected dispatch had shown her position to be one degree of longitude nearer the coast than at first reported, the dispatch of the Relief to search for her at or near her corrected position would be dictated by humanity, as well as by a just regard to the material interest in charge of her agents. When the Monarch started, the second dispatch had not been received. She therefore set out without any other information than that possessed by the Vigilant. The Vigilant was as capable of performing the service as the Monarch, and the compensation to be paid the latter was limited to 60 hours' service at the stipulated rate. Why, then, was the Monarch employed? The answer is obvious. It was from the fear that, if not bound by a contract, the Monarch would at once start out as a volunteer salvor, and, in the event of success, claim a salvage reward, perhaps 10 or 20 times as great as the price at which she was willing to contract to perform the service.

This apprehension was, I think, founded on a misapprehension of the law. Had the agents of the Monarch been informed that a tug had already been dispatched, and that another was held in readiness to start at once on the receipt of intelligence then momently expected, and that the owners had taken all measures in their judgment necessary to secure the steamer's safety, the Monarch would have had no right to obtrude her services on the steamer, and, forestalling the tugs dispatched and to be dispatched by the owners, claim a salvage recompense out of all proportion to the price at which she was willing to undertake the service. In the case of *Protection Co.* v. *The Charles P. Chouteau*, 5 Fed. Rep. 463, where aid tendered to a burning vessel was absolutely declined, but an attempt was made to compel the acceptance of the services of the pretended salvors, the court not only refused salvage reward, but held that all right to compensation for expenses incurred in going to the relief of the burning vessel was forfeited by the misconduct of the intrusive salvors. In this case, BILLINGS, J., observes:

"If the master of a burning vessel prefers to allow her to burn, rather than to permit outside parties to extinguish the flames, he may do so. He has a perfect right to decline any assistance that may be offered him. He should not be assisted against his will."

I should hesitate to accept the view of the master's right and duties as broadly as it is here laid down. But where the owners of a vessel in peril have taken all measures in their judgment necessary to insure her safety, and those measures are adequate, and all that prudence requires, other parties have no right to obtrude their services, and anticipate the employment of the means adopted by the owners, and then, if successful, claim a salvage recompense. Such an enterprise savors more of a predatory expedition than a salvage service to be encouraged and rewarded on grounds of public policy. It is said by Mr. Justice BRADLEY in *The Bolivar* v. *The Chalmette*, 1 Woods, 398:

"If my ship is disabled, but perfectly safe for the time being, and I go ashore to employ a tug-boat to tow her into port in mild weather, then presenting no danger or risk, can the owners of vessels whose business it is to do just such work decline my employment, and hasten off in a race to see which shall first seize my ship as a salvage prize? This, instead of encouraging that enterprise and daring which the laws relating to salvage are intended to foster, would be to encourage sharp practices and unconscionable speculation."

In this case the agent of the tug-boat declined the office of towing the bark for an agreed compensation, but said he was going down to take his chances as a salvor, and make a claim for salvage services. Mr. Justice BRADLEY characterizes this conduct as "somewhat extraordinary," and adds:

"Had not the captain finally yielded to this proposition, * * * it might well have been doubted whether it was a case of salvage at all."

These observations are commended to us not less by their justice and good sense than by the authority of the eminent judge by whom they were made.

At 5 o'clock Capt. Hawley called, pursuant to appointment, at the office of Goodall, Perkins & Co., and was informed that no dispatch had been received from the mate. He was also told, as he says, by Gov. Perkins, that Capts. Gray and Griffith were "kicking" because he had not taken one of their tugs, and he thought he would have to take the Monarch. Capt. Hawley replied that he was coaling up the Relief, and would be ready shortly; to which Gov. Perkins answered that it was not necessary, as he thought he would take the Monarch. In fact he had already engaged her. Capt. Hawley was informed a few minutes after leaving the office that orders had been given to the Monarch to go out as soon as possible. He at once telephoned to Mr. Spreckels the information that the Monarch was about to start, and received in reply orders to dispatch the Relief at once. She accordingly put to sea at 7:30 P. M. of the 3d, and returned on the morning of the 5th, with the steamer in tow. For this service a salvage compensation is claimed. It does not appear that Capt. Hawley received from Gov. Perkins any precise and definite announcement that he had abandoned all idea of dispatching the Relief, and would release her from her conditioned engagement, to be in readiness to start on the terms agreed upon if the mate's second dispatch should show the steamer's position to have been erroneously stated. He did say, however, that he would have to take the Monarch, and that he thought it unnecessary for the Relief to continue her preparations for immediate departure, and he omitted to inform Capt. Hawley that he had made a contract with the Monarch, and even had had a verbal arrangement for her employment before he made the agreement with Mr. Spreckels for the services of the Relief. Whether Gov. Perkins had finally and absolutely determined not to employ the Relief, no matter what information as to the steamer's true position might be communicated by the mate, it is impossible to say. But it is evident that Mr. Spreckels and Capt. Hawley considered themselves released from their agreement to hold the Relief in readiness to go to the assistance of the steamer on the terms agreed on, if required, on the receipt of the mate's dispatch. I am inclined to suspect that the dispatch of the Relief was largely due to irritation at the employment of a tug of a rival company, and to resentment at what they considered unfair treatment on the part of the claimants. But the right of the libelants to a salvage recompense does not depend upon the result of any inquiry into the motives and probable intentions of the claimants. It must be determined on principles broader and more susceptible of general application. The owner of a vessel disabled or in distress does not thereby lose the control of his property. He has the right to refuse or accept any offers of assistance that may be made, or to adopt his own measures for the preservation of his vessel. When he has provided means for her rescue, in his judgment adequate and effectual, he is not at the mercy of any stranger who, with full knowledge of this fact, may sally out to "take his chances" of winning in a race "to see which shall first seize the ship as a salvage prize." *The Bolivar* v. *The Chalmette, ubi supra.* That the claimants had the right to employ the Monarch, or as many other tugs as they saw fit, cannot be questioned.

They had already dispatched the Vigilant, belonging to the libelants, to the assistance of the disabled steamer. The Monarch was about to start on the same errand. The Relief was sent out because.the Monarch had been engaged. The success of her enterprise and securing of the salvage prize they hoped to gain depended not merely on her beating the Monarch in the race, but also the Vigilant, their own vessel, which was under contract to do all in her power to effect the towage service. Whatever be the justice of the libelants' belief that the claimants' intention was to "tie up" the Relief under the expectation of an employment which was not to be offered, they would have had no cause of complaint if the claimants had, when the mate's second dispatch was received, sent out the Relief on the terms agreed upon. I shall award the libelants all that they can justly claim, by giving the sum for which they were willing to undertake the service; nor shall I do any injustice to the claimants, for Gov. Perkins, when informed that the Relief had gone out on the preceding evening, made no protest, and expressed no dissatisfaction; on the contrary, he said that he was glad she had gone. The steamer was brought in by the Relief. Under all the circumstances, I think it just that the claimants should pay the stipulated price for the service.