## THE INDIAN.

### (Circuit Court of Appeals, Fifth Circuit. February 11, 1908.)

### No. 1,688.

1. SALVAGE—NATURE OF SERVICES—"SALVAGE SERVICE."

The rescue of a vessel already on fire, tied to a burning dock, an immense warehouse, filled with merchandise, giving out such heat as to drive men from decks of ships tied alongside, was a salvage service of a high order.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Salvage, §§ 18–20.

For other definitions, see Words and Phrases, vol. 7, pp. 6316–6318.]

2. SAME—VALUE OF SERVICES.

The Indian, a steam vessel with a gross measurement of 9,191 tons, 4 boilers, twin screws, and triple expansion engines, and a valuable cargo, was set on fire from a burning wharf and large warehouse, to which she was tied. Though the pumps were immediately started and water thrown over the decks and the woodwork within range of the flames, the fire extended rapidly until the woodwork and other inflammable materials on all the after part of the vessel took fire, and as fast as extinguished in one place would break out again. The heat was intense, preventing effectual work whereupon two tugs, one of 569 tons, with an indicated horse power of 2,500, and equipped with pumps of great capacity, and the other of 150 tons, with an indicated horse power of 875, and equipped with good pumping machinery, came to the Indian's relief, and, after some delay owing to the position of another vessel, succeeded in pulling the Indian away from the burning wharf, when she was burning fiercely from the stern to the main bridge. After some pumping by the heavier tug, her hose was carried by her master and a number of his crew up to and upon the after deck, where they rendered valuable assistance in keeping down the fire and assuaging the heat. Both tugs acted in concert, and succeeded in extinguishing the flames, after which the appraised value of the Indian and her cargo was fixed at $463,229.17. *Held*, that a salvage allowance of $5,000 to the larger tug, and $2,500 to the smaller one, was inadequate in so far as the larger tug was concerned, and that the award as to it should be increased to $7,500.

[Ed. Note.—Awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

3. SAME—VOLUNTARY SERVICES.

Where the master of a burning vessel was in command, and refused to accept the services of certain voluntary salvors, and ordered them off as soon as he learned of their presence and offered assistance, the fire being then under control of two efficient tugs, such voluntary salvors were not entitled to an allowance for services rendered.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Salvage, § 28.]

4. APPEAL—COSTS—REVIEW.

A decree in the exercise of discretion, declaring that each party should pay his own costs, cannot in general be made the subject of appeal.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 2, Appeal and Error, §§ 823–825.]

5. SALVAGE—ALLOWANCE—DIVISION.

Where a tug and crew were entitled to $7,500 for salvage services the amount was distributable—$4,500 to the owner of the tug, and $3,000 to the crew.

Appeal from the District Court of the United States for the Eastern District of Louisiana.

John D. Grace, Chas. S. Rice, and R. B. Montgomery, for appellants.

Henry P. Dart and Benjamin W. Kernan, for appellees.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PARDEE, Circuit Judge. February 26, 1905, the Stuyvesant Dock was a large structure built upon piling extending out to deep water along the river front in the port of New Orleans from Louisiana avenue up to near Napolean avenue, a distance of about 4,800 feet. It was inclosed more or less and roofed above, extended well back, and in the rear were grain elevators, machine shops, etc. It was divided transversely into four compartments by brick or fire walls, and the river front was divided into parts or berths, some 400 feet in length for the berthing of ships. The dock was used for the reception and handling and deposit of all kinds of goods to be shipped, and for the unloading of railroad cars from the rear side and the loading of steamships from the river side. Along the front and over the roofing of the dock extending from the rear to the river side was a wooden box construction called a conveyor, containing the apparatus necessary, and used for, carrying grain from the elevators in the rear to vessels to be loaded while lying along the dock. On the evening of the day mentioned, the British steamship Indian was moored at berth 5 of the dock, her bow extending into berth 6 a little above the first fire wall. Outside the Indian, and with lines on the Indian, lay the steamship Brayhead. In berth 6, just ahead of the Indian, lay the steamship Victoria. Outside the Victoria, and tied to her port side, was a coal palace, a coal boat, and pump boat so fastened that the stern of the palace was a little off of midship of the steamer, while the stern of the coal boat extended some 80 feet or more below the stern of the palace. In berth 4, astern of the Indian with head close up, was the steamship Cycle. In berth 2 was the steamship Royal. In all, lying at the dock in the immediate vicinity of the Indian, were some 10 steamships.

The steamship Indian is a steel vessel 489 feet long, 57 feet in breadth and in depth to her ballast tanks 39 feet 7 inches, with a gross measurement of 9,191 tons, 5,190 net, 4 boilers, twin screws, and triple expansion engines. She had taken on as part cargo 350 bales of cotton, 50 tierces of lard, 192,857 bushels of wheat, a small quantity of staves, handles, and gum lumber. While the hull, decks, and masts of the Indian were steel, there was a large amount of wood on the decks—a part of the superstructure; her ropes and some of her rigging were of manila rope and some of wire; and, altogether, there was a large amount of inflammable material on and about her decks. She had steam under one boiler to use for sanitary arrangements of the ship. In this condition of matters, about 6 o'clock in the evening, a fire broke out in the conveyor about 1,600 feet from the lower end of the dock nearly opposite the steamship Indian. As soon as the fire was observed the alarm was given, and the master of the Indian called his crew to fire service. They at once covered the hatches, battened them down and covered them with tarpaulins. In a very few minutes the fire hose were placed and the pumps were started with the boiler

under steam and used for throwing water over the decks and wood-work within range of the flames from the fire on the dock. But the fire extended rapidly and burned with such great heat that, notwith-standing all the efforts of the crew of the Indian, the woodwork and other inflammable materials on all the after part of the Indian took fire, and as fast as extinguished in one place would break out again. The heat became so intense that the crew of the ship serving the hose and elsewhere about the starboard after decks of the Indian were com-pelled to use wet towels over their heads. While the master and crew were fighting the fire on the after deck, the mate made an ineffectual effort to get the ship away from the dock, but as to such effort and its success the evidence is conflicting, and in this case the matter is not very material. At the time the fire broke out and the alarm was given, the tugs R. W. Wilmot and W. G. Wilmot and Corsair were lying on the Algiers side of the Mississippi river, a short distance above the Canal street ferry, with steam up. In response to calls for assistance, the three tugs at once hurried to the burning dock. The Corsair was in the lead and her services were tendered to and rendered to the Cycle lying in the berth astern of the Indian. As the two Wilmot tugs got within calling distance, the captain of the Indian called upon them to come to his assistance and get his ship away from the wharf. By this time the dock was on fire and burning fiercely from the stern to the main bridge of the Indian, a distance of 300 feet, and had also spread rapidly towards the lower end of the dock, so that nearly the whole compartment of the dock, roof, framework, floor, and merchandise were a mass of flames. The steam tug R. W. Wilmot has a gross meas-urement of 569 tons and cost about $155,000, with an indicated horse power of 2,500, and was equipped with pumps of great capacity. The W. G. Wilmot has a gross measurement of 150 tons, cost about $80,-000, with an indicated horse power of 875, and she was fully equipped as a tug and with good pumping machinery. Under the direction of the master of the Indian, the W. G. Wilmot took a line from the port bow of the Indian to pull her out into the stream away from the wharf, and the R. W. Wilmot at the same time fastened to the port quarter of the Indian with two lines, 5 and 11 inch, for the double purpose of assist-ing to get the Indian out from the wharf, and also to assist in putting out the fire burning on the deck and superstructure of the Indian. Aft-er some pumping on the deck by the R. W. Wilmot, at the call from the ship, her hose was carried by her master and a number of his crew up to and on the after decks of the Indian and there under the handling of the R. W. Wilmot's men rendered valuable assistance in keeping down the fire and assuaging the heat that prevailed upon the deck of the Indian. While this was going on, the R. W. Wilmot was backing with strength on the port quarter of the Indian and the W. G. Wilmot, acting in concert, was pulling on the bow to get the ship away from the wharf. For some reason not apparent, there was delay in getting the ship from the wharf even with this powerful assistance which or-dinarily would have moved her out in a few minutes. Numerous sug-gestions were made as to the delay, of which two, though not fully developed by the evidence, are worthy of attention. One arises from

the statement by the engineer of the Indian, in answer to the question, "Did they (the Wilmot tugs) move you out rapidly or slowly?" (answer) "Well, it was not very fast, but there were reasons for that. It was at night. There were a number of other vessels getting away to safety from the wharf, and we had to move out slowly to avoid collisions with other ships." In this connection, we notice that Garland of the W. G. Wilmot testifies, and he is not disputed, that the Brayhead was in the way, and on request did raise her anchor and sheer off so that the W. G. Wilmot could straighten its line; and, further, that as the Indian was being pulled out from the dock a collision was imminent with the Victoria which was only avoided by the work of the R. W. Wilmot in getting stern way on the Indian. There is no evidence in the record showing when and by whom or how the lines of the Indian were ever cast off from the wharf or loosed from the ship, while there is a statement by the berthing master of the dock that, at the time the Wilmot tugs came up, the Indian's lines were still attached to the wharf and there was nobody to unfasten them, and the fire was too heavy to get to them. If the after line of the Indian to the dock was not cast off at the beginning of the fire, the ineffectual attempt of the Indian's mate to get her head out in the current and the hindrance to the first efforts of the Wilmot tugs are both accounted for. However this matter of delay may be accounted for, it is not shown to have been the fault of the Wilmot tugs, which very soon overcame the obstacle, whatever it was; and, both working together, they soon had the Indian out from the burning dock. Immediately this was accomplished, the W. G. Wilmot threw off her line and coming around to the starboard quarter put up two lines of hose and commenced pumping water on the sides and burning decks of the Indian while the R. W. Wilmot towed the vessel to the middle of the river where she was anchored. After anchorage, both Wilmot tugs pumped water on the decks and sides of the Indian until all fire was extinguished.

Under the voluminous and conflicting evidence, it is difficult to say exactly what would have happened to the Indian and her cargo but for the services of the Wilmot tugs; but the evidence leaves us in no doubt that the Indian was at the time of the arrival of the tugs in a position of the greatest peril as to her top-hamper, superstructure, and cargo, and in decided danger of injury to her sides and hull from the excessive heat from the burning dock, and the fire already caught and burning on her decks and in her rigging. It is not to be disputed that the services rendered to the Indian by the Wilmot tugs were salvage services entitling them to be rewarded in a court of admiralty; but it is contended, and the lower court so found, that the services of the tug were of a low order of salvage services, and that the awards should be on that basis. To this contention we cannot agree. The towing of a disabled vessel in still water, the pulling off of a grounded vessel with no circumstances of extra peril, the rescue of a steamboat blown from her wharf with no steam up, and other like cases, are instances of a low order of salvage services rendered by tugs and towboats; but to rescue a vessel already on fire, tied up to a burning dock like the Stuyvesant Dock, an immense warehouse filled with mer-

chandise and giving out such heat as to drive men from the decks of ships tied alongside, is a salvage service of a very high order.

On the theory that the services of the tugs were of a low order of salvage, the lower court awarded the W. G. Wilmot $5,000 and the R. W. Wilmot $2,500, making a total of $7,500, and this amount we consider inadequate under the facts of the case. There is no fixed rule based on value of property salved and character of services rendered to determine the amount of salvage rewards. In practice in this circuit, the courts have used their best judgment, sometimes awarding a percentage and other times a gross sum. The large size general capacity of the Wilmot tugs has been hereinbefore given. The appraised value of the Indian after the fire was $347,256.47, and of her cargo $116,035.64, making for both $463,229.17. Three per cent. of this total is $13,896.87, and on the percentage basis this sum would appear to be not excessive as an allowance for salvage. The judge a quo allowed a gross sum, and on that line we can well approve of the sum of $12,500. Considering the decree of the lower court, all the circumstances developed by the evidence, and the services rendered by the Wilmot tugs severally, we are of opinion that the award to the W. G. Wilmot is not so inadequate as to require correction; but that the award to the R. W. Wilmot is inadequate. Considering the greater capacity and value of the R. W. Wilmot and the fact that her valuable services were rendered not only in helping materially to get the Indian away from the burning dock, but also with her master and men in getting aboard the burning ship with hose, and there, in great discomfort if not in actual peril, rendering valuable services in keeping the fire down, we conclude that the award to the R. W. Wilmot should be increased to $7,500.

In the main case in the court below William A. Bisso, master of the tug Baton Rouge Belle, for himself and others, and Joseph A. Bisso, master of the towboat Leo, for himself and others, intervened, claiming for salvage services rendered to the steamship Indian in rescuing her from the fire at Stuyvesant Dock. From an adverse decree, they also appeal. The judge of the lower court disposed of their interventions as follows:

"The intervening libelants, the owner and crews of the Bisso tugs, the Belle of Baton Rouge and the Leo, claimed to have rendered salvage service in extinguishing the fire in the woodwork and rigging after the Indian was moved from the wharf, and while she was being towed to the middle of the river, and after she had come to anchor there. The claimant and the libelants deny that the Bisso tugs came upon the scene until the fire had been practically extinguished and was completely under control, and declare that they were ordered to desist by the captain of the Indian as they approached and began to throw water on the decks. The Bisso witnesses testify that they had been pumping on the Indian for more than 15 minutes before they were ordered off. They claim that as soon as the Indian was moved from the wharf the Belle of Baton Rouge came up between her and the wharf 'and lay along her port side and pumped on her while she was being towed into the river and for several minutes after she was anchored. And they insist that their position was such that they could not be seen from either of the Wilmot tugs, both of which were on the starboard side of the Indian with the flames and smoke from the fire on the rear of the Indian between them and the Baton Rouge Belle. They further insist that the same fire and smoke prevented the captain and crew of the Indian from seeing them when they first

came up. On the other hand, there is the testimony of numerous witnesses that the captain of the Indian called to the Bisso crews as they first came up and began to pump, and ordered them to desist and go away as he had no need of their services, and they were in fact injuring and not helping him. It is impossible to decide with certainty on which side is the truth. But this uncertainty is necessarily fatal to the claim of the intervening libelants. They cannot recover for salvage services until they prove by a clear preponderance of evidence that they helped to extinguish the fire. The evidence does not establish that they rendered any services at all, much less that they rendered any salvage services."

From our examination and consideration of the evidence in the case, we concur with the judge a quo as to the claim of intervening libelants, and only deem it necessary to add that the evidence is clear that as soon as the master of the Indian learned of the presence and offered services of the intervening libelants he refused to accept their assistance and ordered them off. Under nearly all supposable circumstances when the master is in command and control of his own ship he may refuse and reject salvage services, and no volunteer salvor can force on him, and be rewarded for, services which he forbids. See The Choteau (D. C.) 5 Fed. 463; Id. (C. C.) 9 Fed. 211; The Brig Susan, 1 Spr. 502, Fed. Cas. No. 13,630.

In his opinion in the case the judge a quo says:

"This record is incumbered with an enormous amount of irrelevant testimony. While the libelants are entitled to recover an allowance for salvage, in view of the condition of the record, I shall not allow them costs, and under the final decree rendered in the case each party will be required to pay his own costs."

We do not interfere with this part of the decree for two reasons: First, that the criticism of Judge Saunders is fully justified by the record; and, second, as a general rule, the costs are within the discretion of the court, and not subject of appeal. See Taylor v. Woods, 3 Woods, 146, Fed. Cas. No. 13,809.

For reasons herein given, and to give effect to our views, the decree appealed from is amended by striking out that portion of the same awarding various sums to the owner of the steam tug R. W. Wilmot and in favor of the crew of said tug, and inserting in lieu thereof the following:

In favor of the Monongahela River Consolidated Coal & Coke Company, owner of the steam tug R. W. Wilmot, the sum of..........$4,500 00

In favor of the crew of said tug as follows, to wit:

| Name | Salary | To receive |
|---|---|---|
| O. J. Mott, master, | $175 00 | $904 80 |
| S. Hogan, engineer, | 125 00 | 646 50 |
| M. Kornbacher, second engineer, | 70 00 | 362 10 |
| A. Thomas, deck boy, | 40 00 | 207 00 |
| J. Helberger, deck hand, | 40 00 | 207 00 |
| J. Sharp, fireman, | 50 00 | 258 60 |
| M. Baer, oiler, | 40 00 | 207 00 |
| J. Lincoln, coal passer, | 40 00 | 207 00 |
| | | 3,000 00 |

Total ................................................... $7,500 00

And as thus amended the same is in all respects affirmed.

In view of the peculiar circumstances attending the rejection of the

interventions and the award as to costs in the lower court, the costs of this court should be paid by the appellees, other than the Monongahela River Consolidated Coal & Coke Company and the officers, employés, and crews of the steam tugs W. G. Wilmot and R. W. Wilmot.

And it is so ordered.