[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 99-13117
_____

D. C. Docket No. 98-01637-CV-JLK

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 17 2000
THOMAS K. KAHN
CLERK

INTERNATIONAL AIRCRAFT RECOVERY, L.L.C.,
a Nevada Limited Liability Company,

                                        Plaintiff-Counter-
                                        Defendant-Appellee,

      versus

THE UNIDENTIFIED, WRECKED AND ABANDONED AIRCRAFT, her
armament, apparel, and cargo located within
one marine league of a point located at 25-00043'34" N Latitude
and 80-2'8" W Longitude,

                                        Defendant,

UNITED STATES OF AMERICA,

                                        Intervenor-Defendant-Counter-
                                        Claimant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(July 17, 2000)**

Before EDMONDSON, BARKETT and KRAVITCH, Circuit Judges.

KRAVITCH, Circuit Judge:

The United States appeals a district court order upholding the right of International Aircraft Recovery ("IAR") to salvage, over the objection of the federal government, a Navy torpedo bomber that crashed in the Atlantic Ocean during World War II. We hold that the United States, as owner of the plane, can prohibit IAR's salvage efforts; accordingly, we reverse.


I. BACKGROUND AND PROCEDURAL HISTORY

This lawsuit involves a Navy "Devastator" TBD-1 torpedo bomber that crashed off the Florida coast during a training flight in 1943. Built in 1938, the plane flew "neutrality patrol" in the central Atlantic until it was assigned in mid-1941 to the aircraft carrier Yorktown operating in the Pacific. In 1942, the plane participated in the Battles of Midway and the Coral Sea. During the Battle of the Coral Sea, TBD-1 torpedo bombers sank the Japanese aircraft carrier Shoho and badly damaged the carrier Shokaku. The Yorktown suffered substantial damage itself during the battle, but the carrier was able to recover many of her aircraft, including the subject of this suit.

After overhauling the TBD-1, the Navy used the plane for training in Miami, Florida. During a torpedo attack instruction flight on July 1, 1943, the TBD-1 experienced mechanical difficulties. The pilot and crew parachuted safely from the plane, which crashed in deep international waters approximately eight miles east of Miami Beach.

The Navy did not know exactly where the TBD-1 crashed, and it "struck" the plane from the inventory of active aircraft in September 1943. Since that time, the Navy has taken no steps to locate or salvage the plane.

In 1990, a group searching for Spanish galleons located the TBD-1 and offered to sell the location to the National Museum of Naval Aviation. The museum declined because it did not have a budget for new acquisitions. The discoverers then sold the plane's location to Windward Aviation, a corporation controlled by Douglas Champlin, a private collector of fighter planes. Champlin negotiated to salvage the plane and turn it over to the Museum of Naval Aviation in exchange for other aircraft, but the parties never reached an agreement.

Since purchasing the location of the TBD-1, Champlin has conducted two brief salvage operations. In 1994, salvors filmed the wreck site and recovered a portion of the torpedo bomber's canopy. In 1998, Champlin made another

3

videotape and recovered the plane's radio mast. Champlin and the companies he controls, including IAR, have invested over $130,000 in the salvage of the TBD-1.

Worried that other salvors would assert claims to the wreckage, Champlin, as President of Windward Aviation, Inc., filed an in rem action in 1994 to secure his exclusive salvage rights. After the federal government expressed its objections to Champlin's salvage efforts, he voluntarily dismissed the lawsuit and turned the canopy over to the National Museum of Naval Aviation.

After more unsuccessful negotiations with the Navy, Champlin filed this second in rem action through IAR. The action sought an injunction barring any interference with the plaintiff's exclusive salvage rights, and either a full and liberal salvage award or title to the aircraft under the law of finds. The government intervened and both parties filed motions for summary judgment. The district court, holding that IAR had the right to continue its salvage efforts and that it would be entitled to a salvage award, granted IAR's motion and entered final judgment. The court retained jurisdiction to determine the salvage award later, and granted the United States permission to intervene in those proceedings.

IAR claims it is not interested in keeping the TBD-1 itself, but still believes that the plane belongs on display at the National Museum of Naval Aviation. In its final order, the court intimated that during salvage proceedings it might award the

4

TBD-1 to the museum and calculate appropriate compensation for IAR. Both parties agree that the in rem defendant aircraft is of substantial historical value, both because of its participation in the Battles of Midway and the Coral Sea, and because no TBD-1 planes have been preserved for display or study. In fact, the only other known TBD-1 also lies submerged in deep water.

II. DISCUSSION

In its final order, the district court granted IAR permission to proceed with salvage operations over the objection of the United States. The United States argues that it is the owner of the crashed TBD-1, and that as such, it can reject salvage efforts by third parties.

A. Abandonment

The law of salvage generally governs efforts to save vessels in distress. Under the law of salvage, rescuers take possession of, but not title to, the distressed vessel and its contents. See Columbus-America Discovery Group v. Atlantic Mut. Ins. Co., 974 F.2d 450, 459 (4th Cir. 1992); Martin J. Norris, The Law of Salvage, in 3A Benedict on Admiralty § 150 (rev. 7th ed. 1999). A court then fashions an appropriate award for the salvors' services. A vessel without owner, however, is

5

subject to the law of finds, summed up succinctly as "finders keepers," rather than the law of salvage. See id. at 459-60; Norris, supra, § 158. Admiralty law presumes that owners do not give up title to ships and cargo in marine peril, even if cargo is swept overboard or a crew has to leave its vessel on the open water. See Columbus-America, 974 F.2d at 460 (quoting Hener v. United States, 525 F. Supp. 350, 356-57 (S.D.N.Y. 1981)); Norris, supra, § 150. The law recognizes, however, that owners can "abandon" all interests in their vessels. See Fairport Int'l Exploration, Inc. v. The Shipwrecked Vessel, 177 F.3d 491, 498 (6th Cir. 1999); Treasure Salvors, Inc. v. The Unidentified Wrecked & Abandoned Sailing Vessel, 569 F.2d 330, 336-37 (5th Cir. 1978).[1]

IAR argues that the district court made a factual finding, which we would review for clear error, that the Navy had abandoned all interest in the wrecked TBD-1. A careful reading of the court's opinion, however, reveals that it contains no such finding. Although the district court discussed in its opinion whether the United States retained ownership of the TBD-1 or had abandoned the plane, it did not resolve the matter. "[T]he issue of abandonment and ownership are [sic] secondary to the question of whether this Court can protect the Plaintiff's ongoing

---

[1] Decisions by the former Fifth Circuit issued before October 1, 1981 are binding as precedent in the Eleventh Circuit. See Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981 (en banc).

6

federal salvage rights as to the <u>In Rem</u> Defendant aircraft," wrote the court.[2]

Consistent with this focus on salvage rights rather than title under the law of finds, the court retained jurisdiction and clearly envisioned conducting salvage award proceedings in the future. Had IAR acquired title to the TBD-1 through the law of finds, there would be no basis for salvage award proceedings because courts do not supervise the efforts of owners to preserve their own property.

Although the court's opinion strongly suggests that the court believed the United States had abandoned the TBD-1, it was correct to avoid such a holding based on the evidence before it. The Constitution gives Congress the power to dispose of all property, real and personal, belonging to the United States. <u>See</u> U.S. Const. art. IV, § 3, cl. 2 ("the Property Clause"). As courts consistently have recognized, the federal government cannot abandon property absent an affirmative act authorized by Congress. <u>See</u> <u>Royal Indem. Co. v. United States</u>, 313 U.S. 289, 294, 61 S. Ct. 995, 997 (1941).

> The Government, which holds its interests . . . in trust for all the people, is not to be deprived of those interests by the ordinary court rules designed particularly for private disputes over individually owned pieces of property; and officers who have no authority at all to

---

[2] Op. at 17, <u>in</u> R1, Tab 32.

dispose of Government property cannot by their conduct cause the Government to lose its valuable property rights by their acquiescence, laches, or failure to act.

United States v. California, 332 U.S. 19, 40, 67 S. Ct. 1658, 1669 (1947). In the realm of admiralty law, courts have held that the United States has not abandoned its interests in ships sunk over a century ago during the Civil War. See United States v. Steinmetz, 973 F.2d 212, 222-23 (3d Cir. 1992); Hatteras, Inc. v. The U.S.S. Hatteras, 1984 A.M.C. 1094, 1097-1101 (S.D. Tex. 1981).

IAR argues that the Navy abandoned all interests in the TBD-1 when it struck the bomber from its inventory of active planes. This argument relies heavily on the response of Dr. William Dudley, the Director of Naval History for the U.S. Navy, to a hypothetical question during his deposition. Asked how an aircraft carrier captain who destroyed excess planes at sea before returning to port at the end of World War II would indicate the "final disposition of those aircraft" to a new captain taking over command of the carrier, Dr. Dudley speculated that "[i]f there is an inventory, I would expect to see some kind of an inventory," and that "[t]he term usually used [on such an inventory] is stricken."[3]

_____

[3] Dudley Dep. at 61, in R1, Tab 28, Ex. A.

8

Dr. Dudley qualified his answer as conjectural, and expressed the need to research the question.[4] Moreover, Dr. Dudley's answer does not address how the Navy would officially divest itself of all property interests in those destroyed planes. Later during the deposition, Dr. Dudley clarified that the Navy could abandon title to an aircraft only by asking Congress to pass specific legislation.[5] In an earlier affidavit, Dr. Dudley testified that "[t]he term 'stricken' refers to the administrative action which removes an aircraft from active service and the related maintenance and reporting requirements for such service, but it does not denote or imply a final disposition of such aircraft."[6] This interpretation is consistent with a Navy circular distributed in 1944 recommending the "striking" of all aircraft that had crashed or were heavily damaged, *to be followed by salvage operations*.[7] IAR did not cite, and we could not find, any statute in effect in 1943 authorizing the

---

[4] See id. at 60.

[5] See id. at 71.

[6] Dudley Aff. at para. 11, in R1, Tab 20, Ex. 1.

[7] See J.S. McCain, Deputy Chief of Naval Operations, Aviation Circular Letter No. 72-44, Aircraft - Striking and Disposition Of, at para. 2 (July 24, 1944), in R1, Tab 28, Ex. B. The analogous case of Kern Copters, Inc. v. Allied Helicopter Serv., Inc., 277 F.2d 308 (9th Cir. 1960) also is consistent with this interpretation. In Kern, the Ninth Circuit concluded that the Army did not abandon a helicopter that had crashed in Guatemala by "dropping [it] from accountability records." Id. at 312-13.

9

Navy to abandon planes by simply "striking" them from the inventory of active aircraft.

The district court suggested that the Navy may have abandoned the TBD-1 pursuant to the Surplus Property Act of 1944, which directed that "[s]urplus property shall be disposed of." Pub. L. No. 78-457, § 4, 58 Stat. 765, 768 (1945). Far from a rigid decree, however, the Act mandated only that the disposal of surplus property occur "to such extent, at such times, in such areas, by such agencies, at such prices, upon such terms and conditions, and in such manner, as may be prescribed in or pursuant to this Act." Id. The Act did not mention the abandonment of property; its focus instead was on the *sale* of surplus of World War II matériel, including salvage and scrap. See id. §§ 2 & 15, 58 Stat. at 766, 772-73.[8]

The Act established a Surplus Property Board to regulate and facilitate the disposal of excess military supplies, see id. at § 5, 58 Stat. at 768, and subsequent legislation renamed the Board as the Surplus Property Administration, see Pub. L. No. 79-181, 59 Stat. 533, 533 (1945). It was the Surplus Property Administration that first adopted regulations permitting agencies to abandon war matériel. See

---

[8] The Act also permitted the donation of surplus supplies in certain circumstances. See Pub. L. No. 78-457 § 13(b), 58 Stat. at 768, 771.

10

Surplus Property Administration Regulation § 8319, 10 Fed. Reg. 14966 (1945).[9]

Even in the most permissive scenario, according to these regulations, agencies could only abandon property after an affirmative finding made by a "responsible officer, approved by a reviewing authority," and reduced to writing. See id. § 8319.7, 10 Fed. Reg. at 14967.[10] The Navy neither made such findings nor compiled the written report required to abandon property pursuant to the Surplus Property Administration's regulations.[11]

As an alternative argument, IAR claims that the Property Clause does not apply in the admiralty context and that we instead should apply the common law

---

[9] See also Surplus Property Administration Regulation § 8304.13, 11 Fed. Reg. 180 (1946) (dictating that the "abandonment of surplus aeronautical property shall be governed by the provisions of Part 8319").

[10] Typically, the process for abandoning property was more onerous, requiring not only written factual findings about the property's value or the cost of maintenance and handling, but also publication of a notice for thirty days offering to sell or donate the property. See id. § 8319.3 & 8319.6, 10 Fed. Reg. at 14967.

[11] IAR points out that these regulations only apply to property in "the continental United States, its territories and possessions." Surplus Property Administration Regulations §§ 8304.2 & 8319.2. Even assuming that these regulations would not cover an airplane that was based in the continental United States but that crashed in international waters, however, does not lead to the conclusion that the United States has abandoned the in rem defendant TBD-1. As explained in the text, the primary method for disposing of surplus property under the 1944 Act was by sale. This holds true for aircraft beyond the United States' territorial limits. See Surplus War Property Administration Regulation § 4, 9 Fed. Reg. 11727 (1944) (establishing a pricing policy for surplus aircraft both within the United States and abroad). Before Regulation § 8304, the Surplus Property Board or Administration apparently had to consider requests to dispose of surplus property in an extraordinary manner (such as by abandonment) on a case-by-case basis. See, e.g., Surplus Property Board Special Order 18, 10 Fed. Reg. 11039 (1945) (permitting the abandonment of surplus submarine and torpedo netting by the Navy). There is no indication in the record that the Surplus Property Board or Administration granted permission to abandon crashed Navy planes.

test for abandonment to determine whether the federal government has lost title to the TBD-1. In support of its position, IAR cites the Supreme Court's statement in California v. Deep Sea Research, Inc., 523 U.S. 491, 508, 118 S. Ct. 1464, 1473 (1998), that "the meaning of 'abandoned' under the [Abandoned Shipwreck Act] conforms with its meaning under admiralty law." Deep Sea Research is inapposite, however, for we have no cause to interpret the Abandoned Shipwreck Act in this case.[12] Furthermore, Deep Sea Research involved a privately-owned steamship with privately-insured cargo. See id. at 495, 118 S. Ct. at 1467. IAR cites no other cases for the proposition that the common law of admiralty supercedes the Constitution, and we do not find the argument convincing.

B. Salvage

In ruling that the United States could not prevent IAR's efforts to raise the in rem defendant TBD-1, the district court concluded that the law of salvage gives salvors the absolute right to aid any vessel that is in a state of marine peril if a prudent owner would have accepted the assistance. No one disputes that the TBD-

---

[12] The Abandoned Shipwreck Act asserts title to abandoned shipwrecks "embedded in submerged lands of a State" on behalf of the federal government, and then transfers that title "to the State in or on whose submerged lands the shipwreck is located." 43 U.S.C. § 2105 (2000). Neither party has argued that the Act applies in this case, perhaps because the in rem defendant is not a shipwreck and is not "embedded in the submerged lands of a State."

1 torpedo bomber, submerged in a corrosive environment and slowly disintegrating, is in a state of marine peril.[13]  The district court, however, under-appreciated the authority of a vessel's owner to prevent others from interfering with its property.

The law of salvage is intended to encourage rescue, see Columbus-America, 974 F.2d at 460 (quoting Hener v. United States, 525 F. Supp. at 356), and often aid must be administered quickly when ships are in peril.  Therefore, when a ship is in distress and has been deserted by its crew, anyone can attempt salvage without the prior assent of the ship's owner or master.  See The Laura, 81 U.S. (14 Wall.) 336, 344-45 (1871); The Barque Island City, 66 U.S. (1 Black) 121, 128 (1861); Norris, supra, § 136.  Put another way, when a salvor comes upon a vessel in distress, he can assume the owner would want assistance.  The owner of the derelict vessel cannot contest the salvor's right to attempt a rescue by claiming after the fact that the assistance was unwanted.  See, e.g., The Laura, 81 U.S. at 344-45.

---

[13] Nor do the parties dispute that the law of salvage can apply to submerged airplanes.  Although the archetypical case of salvage may involve a damaged ship in danger of sinking, "[i]t is settled that all manner of objects other than vessels and their cargo are subject to salvage."  2 Thomas J. Schoenbaum, Admiralty and Maritime Law § 16-2 (2d ed. 1994).  Raising sunken craft and property is a recognized salvage service, see Norris, supra, § 31, and courts have allowed salvage claims for long-submerged wrecks, see, e.g., Platoro Ltd. v. The Unidentified Remains of a Vessel, 695 F.2d 893, 901-02 (5th Cir. 1983).

This rule of law, however, does not mean that an owner cannot reject salvage assistance in a timely manner. It is useful to quote the full passage in the Supreme Court opinion cited by the district court for its "prudent owner" proposition: "While salvage cannot be exacted for assistance forced upon a ship, her request for or express acceptance of the service is not always essential to the validity of the claim. It is enough if, under the circumstances, any prudent man would have accepted." Merritt & Chapman Derrick & Wrecking Co. v. United States, 274 U.S. 611, 613, 47 S. Ct. 663, 664 (1927) (citation omitted).

In support of its order, the district court cited one relatively recent opinion in which the Ninth Circuit suggested that an owner could only reject salvage services if doing so were prudent. See Tidewater Salvage, Inc. v. Weyerhaeuser Co., 633 F.2d 1304, 1307 (9th Cir. 1980) ("An owner, acting as a prudent person, may refuse salvage assistance by completed communication to the prospective salvor at any time before the act of salvage."). The court authorized a salvage award, however, because it determined that the Weyerhaeuser lumber company had not rejected effectively the assistance of the salvors.[14] The caveat in Tidewater Salvage about the "prudent owner" is therefore dicta, and it appears never to have

---

[14] The salvors in Tidewater Salvage retrieved logs in Coos Bay that had drifted away from lumber mills. The court determined that Weyerhaeuser's blanket policy rejecting such assistance did not put the salvors on notice to ignore particular logs, because the salvors could not determine a log's owner until they had already recovered the drifting lumber. See 633 F.2d at 1307.

14

been put to the test; we could find no decision based on the prudence of rejecting salvage services.

A related basis for the district court's holding was the theory that owners can only reject salvage services if they have made alternative plans to recover their vessels. The court cited Spreckels v. The State of California, 45 F. 647, 649 (N.D. Cal. 1890), which reads, "where the owners of a vessel in peril have taken all measures in their judgment necessary to insure her safety, and those measures are adequate, and all that prudence requires, other parties have no right to obtrude their services." The Spreckels court later stated that "[t]he owner of a vessel disabled or in distress does not thereby lose the control of his property. He has the right to refuse or accept any offers of assistance that may be made, *or* to adopt his own measures for the preservation of his vessel." Id. at 650 (emphasis added). The equivocation is understandable, for both of the statements quoted above are dicta, unconnected to the resolution of the case. The Spreckels court, like the Ninth Circuit in Tidewater Salvage, granted a salvage award because the owner of the distressed vessel had not rejected the salvors' services.[15] See id. at 651.

_____

[15] The court cited two other cases, but neither supports either the proposition that owners can reject aid only if it would be "prudent" or the notion that owners can reject aid only if they have made arrangements to save their vessels on their own. Manchester Brigade v. United States, 276 F. 410, 413 (E.D. Va. 1921) simply holds that a salvage award is available when a vessel calls for and accepts assistance, but dismisses the responding vessel before its mission is accomplished. In Hamburg-American Line v. United States, 168 F.2d 47, 56 (1st Cir. 1948), the First Circuit held that

We reject the district court's reasoning and instead interpret the law of salvage to permit the owner of a vessel in marine peril to decline the assistance of others so long as only the owner's property interests are at stake. This view is consistent with the Supreme Court's statement in Merritt & Chapman that "salvage cannot be exacted for assistance forced upon a ship." 274 U.S. at 613, 47 S. Ct. at 664.

Other cases strongly support this interpretation of salvage law as well. In an oft-cited case, a district court in Louisiana stated the rule in forceful language: "If the master of a burning vessel prefers to allow her to burn rather than to permit outside parties to extinguish the flames, he may do so. He has a perfect right to decline any assistance that may be offered him: he should not be assisted against his will." New Harbor Protection Co. v. Steamer Charles P. Chouteau, 5 F. 463, 464 (D. La. 1881); accord The Indian, 159 F. 20, 25 (5th Cir. 1908) ("Under nearly all supposable circumstances when the master is in command and control of his own ship he may refuse and reject salvage services, and no volunteer salvor can force on him, and be rewarded for, services which he forbids."); cf. Legnos v. M/V

---

the Navy was entitled to a salvage award for saving a German freighter scuttled and abandoned by its crew. The First Circuit concluded that the freighter's master had never rejected the offer of salvage assistance. The court also considered the "dictates of equity": the ship's owner could not claim both that it wanted the freighter to sink and that the ship should be returned to its possession. Id. at 55-56.

Olga Jacob, 498 F.2d 666, 672 (5th Cir. 1974) ("So long as the services . . . are not rejected by those in authority a bystander or interloper is eligible for salvage award in proportion to the value of his contributory efforts.").[16]  We have no occasion in this case to consider whether an owner could refuse salvage assistance if anything other than its own property interests were at stake.[17]  Cf. Ramsey v. The Pohatcong, 77 F. 996, 997 (S.D.N.Y. 1896) (holding that a tug boat was "bound to respect the master's decision [refusing salvage assistance], and had no legal right to impose [its] services upon him," at least as long as the refusal did not injure, among other things, the property interests of others).

In the context of salvage claims pertaining to historic wrecks, numerous courts have held that title holders can prevent salvors from raising long submerged

---

[16] The authors of admiralty treatises agree that owners can reject salvage assistance.  According to Martin J. Norris, "Salvage services should not be thrust upon the unwilling. . . . It is the privilege of the master to accept proffered salvage services or not, so long as the vessel in distress is then in a position where nothing but ordinary property interests are involved."  Norris, supra, § 114 (footnote omitted).  Another treatise expresses the same view: "Salvage cannot be forced upon an owner or his agent in possession of the vessel; a salvor who acts without the express or implied consent of the owner is a 'gratuitous intermeddler,' who is not entitled to any salvage award."  2 Thomas J. Schoenbaum, Admiralty and Maritime Law § 16-1 (2d ed. 1994).  Addressing the more specific issue of historic wrecks, the treatise author reasons that "[o]nly in a rare case where the governmental owner gives express or implied consent to salvage, should an award be given because the government has full power to reject or prohibit the services."  Id. at § 16-7 (footnote omitted).

[17] IAR suggests that as a matter of policy, we should permit the salvage of the TBD-1 because its condition is deteriorating and time for recovering the plane is running short.  We have no occasion to consider this policy argument, however, because it does not implicate any rights or legally cognizable interests--beyond that of the United States in its own property--that could affect our interpretation of the law of salvage.

17

vessels. The Fifth Circuit noted that "[a] salvage award may be denied if the salvor forces its services on a vessel despite rejection of them by a person with authority over the vessel," but held that the titleholder to an historic ship submerged off its shores had not rejected the plaintiff's salvage services. See Platoro Ltd. v. The Unidentified Remains of a Vessel, 695 F.2d 893, 901-02 (5th Cir. 1983). A Virginia district court held that a plaintiff could not continue salvage operations on an 1802 Spanish shipwreck without the permission of Spain, which retained title to the submerged vessel. See Sea Hunt, Inc. v. The Unidentified, Shipwrecked Vessel or Vessels, 47 F. Supp. 2d 678, 692 (E.D. Va.1999); see also Lathrop v. The Unidentified, Wrecked & Abandoned Vessel, 817 F. Supp. 953, 964 (M.D. Fla. 1993); Jupiter Wreck, Inc. v. The Unidentified, Wrecked and Abandoned Sailing Vessel, 691 F. Supp. 1377, 1389 (S.D. Fla. 1988) ("'[P]otential salvors' do not have any inherent right to save distressed vessels. Their activities must be subject to the owner's acquiescence."). Finally, this circuit considered the case of an eighteenth century ship sunk in the waters of Biscayne National Park and, after holding that the plaintiff was not entitled to a salvage award because the vessel was not in marine peril, noted that "the owner of the property [the United States] may not even have desired for the property to be 'rescued.'" See Klein v. The

18

<u>Unidentified, Wrecked & Abandoned Sailing Vessel</u>, 758 F.2d 1511, 1515 (11th Cir. 1985).

Based on this review of the law of salvage, we conclude that IAR has no right to continue salvage operations over the express objections of the TBD-1's owner. On the other hand, IAR may be eligible for a salvage award for Champlin's past efforts. A party states a valid claim for a salvage award if it renders voluntary assistance that contributes to the rescue of a vessel in marine peril. <u>See</u> <u>id.</u> at 1515 (describing elements of a salvage award claim); Norris, <u>supra</u>, § 2. Champlin's past endeavors appear to satisfy these general criteria; the TBD-1 has been in a state of marine peril since he learned of its location, Champlin's efforts to recover the plane have not been based on a legal duty or contractual obligation, and Champlin has taken constructive steps toward the ultimate preservation of the aircraft.

Whether IAR is eligible for a salvage award for Champlin's efforts obtaining the location of the submerged TBD-1, videotaping the wreck, and returning the plane's canopy and radio mast to dry land depends on when the United States rejected the salvage efforts of Champlin and his companies. The record contains evidence of objections by the United States to Champlin's efforts stretching back

19

to at least 1993.[18]   Furthermore, some courts have entertained the possibility that laws regulating the use of public property could provide a "constructive rejection" of salvage of publicly owned vessels.  See Lathrop, 817 F. Supp. at 964; cf. Platoro, 695 F.2d at 902.  On the other hand, IAR maintains that Champlin negotiated with the Navy about trading the TBD-1 torpedo bomber for vintage aircraft already in the government's possession, and some evidence in the record might indicate that the Navy at times acquiesced to Champlin's salvage efforts.[19] We remand for the district court to consider when the United States effectively rejected the salvage efforts of IAR and its predecessors-in-interest, and to calculate a salvage award, if appropriate, for their past efforts.

III.

We REVERSE the district court order permitting IAR to continue salvage operations on the in rem defendant aircraft, the TBD-1, and we REMAND for further proceedings consistent with this decision.

---

[18] See Letter from W.S. Dudley, Director of Naval History, United States Navy, to Douglas L. Champlin, President, Historic Aircraft Recovery, Inc. (Nov. 17, 1998), in R1, Tab 12, Ex. 6; Letter from Damon Miller, Trial Attorney, Department of Justice, to David Paul Horan (Feb. 29, 1995), in R1, Tab 12, Ex. 8; Letter from J. Bernard Murphy, Federal Preservation Officer, United States Navy, to Milan G.W. Slahor (June 25, 1993), in R1, Tab 12, Ex. 7.

[19] See Facsimile from Douglas L. Champlin to Capt. R.L. Rasmussen, Director, National Museum of Naval Aviation (July 26, 1995), in R1, Tab 18, Ex. G.