[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
June 18, 2004
THOMAS  K. KAHN
CLERK

No. 02-16997
Non-Argument Calendar
_____

D. C. Docket No. 98-01637-CV-JLK

INTERNATIONAL AIRCRAFT
RECOVERY, L.L.C.,
a Nevada Limited Liability Company,

                                                    Plaintiff-Counter-
                                                    Defendant-Appellant,

                          versus

THE UNIDENTIFIED, WRECKED
AND ABANDONED AIRCRAFT,
her armament, apparel, and cargo located
within one marine league of a point located at
25-00043'34" N Latitude and 80-2'8" W Longitude,

                                                    Defendant-Appellee,

UNITED STATES OF AMERICA,

                                                    Intervenor, Counter-
                                                    Claimant-Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Florida
_____

**(June 18, 2004)**

Before CARNES, HULL and KRAVITCH, Circuit Judges.

PER CURIAM:

Plaintiff-appellant, International Aircraft Recovery, L.L.C., ("IAR") appeals the district court's entry of summary judgment in favor of the United States.

In 1990, Scientific Search Associates, a group of salvors searching for Spanish galleons, located the wreck of a Navy "Devastator" TBD-1 torpedo bomber ("TBD") that crashed off the coast of Florida on July 1, 1943. Scientific Search Associates videotaped the wreck and offered to sell the video and the location of the wreck to the National Museum of Naval Aviation ("NMNA"). The NMNA declined. On February 8, 1991, Captain Rasmussen, director of the NMNA, wrote to Scientific Search Associates. In that letter, Rasmussen advised Scientific Search Associates that:

> 2. The TBD Devastator, its residue and/or component parts are owned by the Department of the Navy. The Department of the Navy has assigned all salvage rights, custody and control of the TBD Devastator, its residue and component parts to the [NMNA]. . . .

7. The Department of the Navy, and its Museum [NMNA], have not given anyone the authority, either expressly or impliedly, to extract from the Atlantic Ocean, part or all of the TBD Devastator. Any attempt at so salvaging the TBD, without the express written permission of the Department of the Navy, through its Museum, will result in a recommendation from this office to institute whatever action is appropriate to prevent an unauthorized taking.

After sending this letter, the Navy learned that Douglas Champlin, president of the predecessor to IAR, was interested in recovering the TBD. As a result, Rasmussen forwarded a copy of the above letter to Champlin on February 20, 1991.[1] Nevertheless, in April 1991, Champlin purchased the coordinates of the TBD from Scientific Search Associates.[2] He also entered into an agreement with Wreck Finders, a salvage company, to salvage the TBD. Over the next few years, Champlin engaged in a series of negotiations with the Navy, which was represented by Rasmussen,[3] in

---

[1] At the time the letter was forwarded to Champlin, Champlin did not know the location of the TBD.

[2] Champlin realized from the beginning that it was possible that no agreement with the Navy would ever be reached; in his deposition, he stated that the whole operation was a "gamble," but that he "thought reasonable men could find a solution."

[3] Captain Rasmussen did not have authority to enter into a final agreement on behalf of the Navy, but, had there been a tentative agreement, he would have forwarded the proposed agreement to the appropriate official.

an attempt to reach an agreement to salvage the TBD. These discussions were fruitless and did not result in a final agreement.[4]

Since 1991, Champlin, through IAR and its predecessors, has conducted two salvage operations of the TBD. In December 1994, IAR recovered a portion of the plane's canopy and filmed the wreck site.[5] Then, in 1998, IAR returned to the wreck site, made another videotape and recovered a radio mast.

The TBD plane has been the subject of much litigation since the discovery of its resting place in 1990. In 1994, IAR's predecessor filed suit, seeking possession of the wreck, exclusive salvage rights, and a salvage award. That suit was dismissed voluntarily.

In 1998, the current litigation began when IAR filed suit in federal court seeking an injunction from interference with its salvage rights, and a salvage award

---

[4] The discussions also resulted in several letters similar to the one quoted above. In January 1992, Rasmussen wrote: "[T]his aircraft still constitutes U.S. Navy property and if disturbed or recovered the Department of Justice will intervene and parties indeed will have to make amends to the federal government." In addition, in June 1993, Bernard Murphy, the Navy's Federal Preservation Officer, wrote to Champlin's counsel: "[O]n the advice of the Navy Admiralty Counsel, your client does not have permission to salve the wreck. An individual who undertakes to intrude upon or remove this aircraft will be subject to criminal prosecution and civil action by the U.S. government." The Department of Justice sent similar letters in February and March of 1995. Finally, in November 1998, Dr. William S. Dudley, the Director of Naval History, wrote to Champlin and expressly prohibited him and his company from attempting any salvage of the TBD.

[5] Champlin claims that the 1994 expedition was done on the advice of NMNA Deputy Director Robert Macon.

or title to the TBD under the law of finds. The district court found that IAR could salvage the aircraft, and retained jurisdiction to determine any applicable salvage fee. On appeal, this court reversed, holding that "the United States, as owner of the plane, can prohibit IAR's salvage efforts." International Aircraft Recovery, L.L.C. v. Unidentified, Wrecked, and Abandoned Aircraft, 218 F.3d 1255, 1256 (11th Cir. 2000). We remanded the case for the district court to "consider when the United States *effectively rejected* the salvage efforts of IAR and its predecessors-in-interest, and to calculate a salvage award, if appropriate, for their past efforts." Id. at 1264 (emphasis added).

On remand, the district court determined that Rasmussen's 1991 letter to Champlin was an effective rejection and that IAR was not entitled to a salvage award for any salvage operations performed after the receipt of Rasmussen's 1991 letter.[6] The district court, therefore, granted summary judgment in favor of the United States. IAR now appeals. The only issue properly before us is whether the 1991 letter operated as an "effective rejection." We hold that it did and affirm.

We review a district court's grant of summary judgment de novo. Pennington v. City of Huntsville, 261 F.3d 1262, 1265 (11th Cir. 2001). Summary judgment is

---

[6] Because all salvage operations occurred after receipt of that letter, the district court determined that IAR was not entitled to any voluntary salvage award.

appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We view the facts and inferences in the light most favorable to the non-moving party. Pennington, 261 F.3d at 1265.

Rasmussen's 1991 letter to Champlin was an "effective rejection" of salvage services. That letter stated: "Any attempt at so salvaging the TBD, without the express written permission of the Department of the Navy, through its museum, will result in a recommendation from this office to institute whatever action is appropriate to prevent an unauthorized taking." In effect, this letter rejects salvage efforts undertaken absent a written agreement with the Navy. IAR stipulated on the record that "there is not now nor has there ever been an agreement with the Navy that was executed or an enforceable agreement where one side or the other could not have backed out." Thus, IAR performed all salvage services after receipt of the Navy's rejection and without a written agreement with the Navy. IAR, therefore, is not entitled to any salvage award.

IAR, admits that there was never an enforceable agreement with the Navy, but makes several arguments to the effect that the Navy "permitted" or "encouraged" IAR into providing voluntary salvage services, or at least "acquiesced" in IAR's conduct.

6

The crux of IAR's argument relies on certain statements made by Robert Macon, the Deputy Director of the NMNA. Although these statements *might* provide some support for IAR's argument, they are insufficient to give rise to a salvage award because, at the time the statements were made, IAR's predecessor had received Rasmussen's 1991 letter. Thus, IAR was on notice that the Navy rejected salvage services. IAR cannot be compensated for operations it conducted after receiving such notice.

IAR also argues that the Navy "tricked" it into providing salvage services, including making public the location of the TBD. To the extent that IAR alleges that the Navy's actions amounted to fraud, and that the Navy negotiated with IAR in bad faith, we make no decision with regard to these claims, because they are not properly before this court.[7]

For the foregoing reasons, we hold that Rasmussen's 1991 letter to Champlin was an "effective rejection" of salvage services and that IAR is not entitled to a

---

[7] The only issue remanded to the district court was whether and when the Navy effectively rejected salvage services, and, consequently, that is the only issue that we can decide. See Litman v. Massachusetts Mut. Life Ins. Co., 825 F.2d 1506, 1510-11 (11th Cir. 1987) (en banc).

We also note that IAR argues that Rasmussen did not have authority to reject salvage services on behalf of the Navy. This argument was not raised in the district court and, therefore, we will not address it on appeal. See Walton v. Johnson & Johnson Services, Inc., 347 F.3d 1272, 1292 (11th Cir. 2003) ("As a general rule, we do not consider arguments raised for the first time on appeal.").

voluntary salvage award for any services provided after that date. Because all salvage services were provided after receipt of the letter, IAR is not entitled to any voluntary salvage award. Accordingly, we AFFIRM the district court.

AFFIRMED