**FATHOM EXPLORATION, LLC, Plaintiff,**

v.

**THE UNIDENTIFIED SHIPWRECKED VESSEL OR VESSELS, etc., in rem, Defendant.**

**No. CIV. A. 04–0685–WS–L.**

United States District Court, S.D. Alabama Southern Division.

Jan. 24, 2005.

Michael E. Mark, Mobile, AL, for Plaintiff.

Gary A. Moore, U.S. Attorney's Office, Mobile, AL, for Defendants.

## ORDER

STEELE, District Judge.

This matter is before the Court on the United States' Motion for a More Definite Statement or, In the Alternative, to Dismiss (doc. 17) and on the State of Alabama and the Alabama Historical Commission's Motion to Dismiss or, In the Alternative, Motion for a More Definite Statement (doc. 22). Both motions have been briefed and are ripe for disposition.

## I. Background.

On October 27, 2004, plaintiff Fathom Exploration, LLC ("Fathom") filed a Verified Complaint bringing suit *in rem* against the Unidentified Shipwrecked Vessel or Vessels, Their Tackle, Equipment, Appurtenances and Cargo Located Within 2 Nautical Miles of Coordinates 30 Degrees 10.220 Minutes North Latitude, 88 Degrees 02.310 Minutes West Longitude (the "Shipwreck"). According to the Complaint, Fathom was the first party and only finder to have discovered and/or engaged in salvage operations upon the Shipwreck, which is alleged to lie "in waters of the Territorial Seas of the State of Alabama and the waters seaward thereof." (Complaint, ¶ 3.) Fathom alleged that it had saved from marine peril and preserved several important artifacts from the site, including one rock, one brick, one piece of pottery and one brass pin. (*Id.*, ¶ 4.)[1] The Complaint further asserted that there is no extant owner of the Shipwreck, and that the Shipwreck is subject to marine peril and is in an utterly helpless condition from which it could not be rescued without Fathom's services. (*Id.*, ¶¶ 12, 14.)

In connection with its purported discovery of the Shipwreck, Fathom asserts the following causes of action: (a) a claim pursuant to the maritime law of finds for exclusive title, ownership and possession of all artifacts that it may salvage from the Shipwreck; (b) a claim for salvage award based on its rescue of the Shipwreck and associated artifacts from their "utterly helpless condition" and "marine peril" (*Id.*, ¶ 14); and (c) a claim for injunction prohibiting rival salvors from conducting search or salvage operations within two nautical miles of the geographic coordinates specified by Fathom.

On October 27, 2004, the Court signed a Warrant of Arrest (doc. 4) for the Shipwreck and appointed Fathom as substitute custodian and special process server.[2] The following day, the Court supplemented those orders by directing Fathom to serve copies of the Complaint, Warrant of Arrest, and associated orders on the United States Attorney's Office in Mobile and on the Alabama Attorney General's Office in Montgomery to place them on notice of this action in the event that either sovereign wished to interpose a claim to the Shipwreck. Fathom complied with this instruction, after which both the United States and the State of Alabama appeared

---

1. The most recent monthly inventory report (doc. 29) submitted by Fathom confirms that to date no further items have been removed from the Shipwreck. Fathom surrendered four artifacts to the Marshal's Office contemporaneously with the filing of the Complaint. Subsequent to issuance of the warrant of arrest on the Shipwreck, the Marshal released those same artifacts back to Fathom on November 4, 2004. The Court understands that such artifacts remain in Fathom's custody, and that Fathom will promptly make these items available in these proceedings if directed to do so.

2. It appears that to date Fathom has not submitted an affidavit setting forth return of service on the Shipwreck, despite having been ordered to do so. (*See* doc. 8.)

in this action and submitted verified statements of right or interest (docs.14, 16).[3] The United States indicated that it is aware of various Civil War-era warships belonging to both the Union and the Confederacy submerged in Mobile Bay in the general vicinity of coordinates identified by Fathom. To the extent that the Shipwreck consists of any such vessels, the United States claims title to and ownership over it pursuant to Title XIV of the Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, which was signed into law on October 29, 2004, as well as prior case authorities. Meanwhile, the State asserted in its verified statement that if the Shipwreck lies in Alabama state waters, then it is a cultural resource to which the State has title, pursuant to the Abandoned Shipwreck Act, 43 U.S.C. §§ 2101 *et seq.*, and the Alabama Underwater Cultural Resources Act, Ala.Code §§ 41-9-291 *et seq.*

Now both the United States and the State have come forward with motions challenging the sufficiency of the Complaint pursuant to Rule 12(e), Fed.R.Civ. P., and Rules C(2)(b) and E(2)(a), Supplemental Rules for Certain Admiralty and Maritime Claims. The core of both claimants' objections is their contention that the Complaint fails to describe the Shipwreck with sufficient particularity to enable them to ascertain (i) the identity and nature of any vessel or vessels that comprise the Shipwreck, and (ii) the specific location and status of the Shipwreck.

## II. Analysis.

### A. *Pleading Requirements in Admiralty Claims.*

As indicated *supra,* both claimants' Motions hinge on assertions that the Complaint is too vague to enable them to frame proper responsive pleadings. Claimants' arguments that the Complaint is deficient are grounded in three distinct procedural rules.

Rule 12(e) of the Federal Rules of Civil Procedure provides, in part, that "If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading." *Id.* Motions for more definite statement are viewed with disfavor and are rarely granted. *See, e.g., Aventura Cable Corp. v. Rifkin/Narragansett South Florida CATV Ltd. Partnership,* 941 F.Supp. 1189, 1195 (S.D.Fla.1996) ("Federal courts generally disfavor such motions."); *Butler v. Matsushita Communication Industrial Corp. of U.S.,* 203 F.R.D. 575, 584 (N.D.Ga. 2001) (noting that class of pleadings that are appropriate subjects for a Rule 12(e) motion is "quite small"). "The motion is intended to provide a remedy for an unintelligible pleading, rather than a vehicle for obtaining greater detail." *Aventura,* 941 F.Supp. at 1195; *see also S.E.C. v. Digital Lightwave, Inc.,* 196 F.R.D. 698, 700 (M.D.Fla.2000) (touchstone for Rule 12(e) motion is unintelligibility, not lack of detail). Indeed, "[a] motion for a more definite statement will only be required when the pleading is so vague or ambiguous that the opposing party cannot respond, even with a simple denial, in good faith or without prejudice to himself." *Campbell v. Miller,* 836 F.Supp. 827, 832 (M.D.Fla.1993) (citations omitted). A motion for more definite statement is not a

---

**3.** The latter claim was submitted jointly by the State of Alabama and the Alabama Historical Commission. For purposes of this Order, the Alabama entities will be referred to collectively as the "State."

substitute for discovery. *See Mitchell v. E–Z Way Towers, Inc.*, 269 F.2d 126, 132 (5th Cir.1959); *Herman v. Continental Grain Co.*, 80 F.Supp.2d 1290, 1297 (M.D.Ala.2000).

Rule C(2)(b) of the Supplemental Rules for Certain Admiralty and Maritime Claims states that for actions *in rem,* the complaint "must describe with reasonable particularity the property that is the subject of the action." *Id.* The parties have not identified, and the Court's research has not disclosed, a single authority expounding on the "reasonable particularity" requirement of Supplemental Rule C(2)(b) in the context of an unidentified shipwreck, or in the admiralty or maritime setting, more generally. In an *in rem* forfeiture action, however, one court has explained that Supplemental Rule C(2)(b) requires "a meaningful level of detail in describing the property" at issue. *United States v. One Parcel of Real Property with Bldg., Appurtenances, and Improvements Known as 384–390 West Broadway, South Boston,* 964 F.2d 1244, 1248 (1st Cir.1992).

Finally, Supplemental Rule E(2)(a) provides that for actions *in rem,* "the complaint shall state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and frame a responsive pleading." *Id.* Once again, neither the parties' briefs nor the Court's own research has divulged a clear exposition of the particularity requirement in the shipwreck context; rather, the overwhelming majority of published decisions applying this rule involve government-initiated forfeiture cases that cannot readily be analogized, either factually or legally, to the circumstances present here.

The Eleventh Circuit has explained that under Supplemental Rules C(2) and E(2),

"Essentially, the complaint must contain factual allegations sufficiently particular to enable a claimant to begin an investigation of the facts and to frame a responsive pleading." *United States v. Real Property and Residence at 3097 S.W. 111th Ave., Miami, Fla.,* 921 F.2d 1551, 1554 (11th Cir.1991). Moreover, authorities are generally in agreement that "the standard of particularity for complaints filed pursuant to the Supplemental Rules is more stringent than is that of the Federal Rules." *United States v. $38,000.00 Dollars in U.S. Currency,* 816 F.2d 1538, 1547 n. 20 (11th Cir.1987); *see also United States v. 1,920,-000 Cigarettes,* 2003 WL 21730528, *3 (W.D.N.Y. Mar.31, 2003) (in forfeiture context, standards under Rule C(2)(b) and Rule E(2)(a) are "more stringent than the general pleading requirements set forth in the Federal Rules of Civil Procedure"); *United States v. Daccarett,* 6 F.3d 37, 47 (2nd Cir.1993) (similar). Nonetheless, the onerous nature of these pleading requirements is necessarily tempered by the recognition that "[d]ue process cannot require the impossible." *Schiffahartsgesellschaft Leonhardt & Co. v. A. Bottacchi S.A. De Navegacion,* 773 F.2d 1528, 1537 (11th Cir. 1985) (heeding unique pressures and temporal realities in finding no violation of Supplemental Rule E(2) in maritime attachment complaint that was based on hearsay).

### B. Discussion of State Motion.

#### 1. Positions of the Parties.

The State's Motion is predicated on a straightforward theory. The Abandoned Shipwreck Act, 43 U.S.C. §§ 2101 *et seq.* ("ASA"), provides that the United States asserts title to any abandoned shipwreck that is (i) embedded in a state's submerged lands, (ii) embedded in state-protected cor-

alline formations on the state's submerged lands, or (iii) on the state's submerged lands and included or eligible for inclusion in the National Register. 43 U.S.C. § 2105(a). By operation of the ASA, the United States transfers its title to all such abandoned shipwrecks "to the State in or on whose submerged lands the shipwreck is located." § 2105(c).[4] The State argues that, if the Shipwreck is an abandoned shipwreck embedded in its submerged lands, then the ASA plainly vests title with the State, in which case the State would have a valid claim. It appears that the State would assert no claim herein if the Shipwreck were not "abandoned,"[5] if it were not "embedded,"[6] or if it were located outside of the State's territorial waters.

The State's dissatisfaction with the Complaint is that it lacks sufficient specificity to enable the State to ascertain the validity of its ASA claim. Specifically, the State decries the Complaint as failing to identify precisely the location of the Shipwreck, but instead enumerating an expansive area embracing a radius of two nautical miles from certain coordinates. According to the State, the geographic territory identified by the Complaint encompasses both Alabama waters and United States waters, such that the State cannot determine whether the Shipwreck lies on submerged State lands. The State further criticizes the Complaint as failing to describe the vessel or vessels and failing to identify how many vessels there are. Based on these defects, the State maintains, dismissal of this action is appropriate because Fathom failed to comply with the particularity requirements of Supplemental Rules C(2)(b) and E(2)(a). Alternatively, the State requests that Fathom be required to replead its Complaint with greater specificity about the nature and location of the Shipwreck.

Fathom counters that it is "well-settled that a salvor may file an admiralty arrest on an unidentified wrecksite" (Response (doc. 25), at 2); however, Fathom offers no decisional authority interpreting Supplemental Rules C(2)(b) and E(2)(a) in such a manner.[7] Fathom further asserts that it is

4. The ASA specifically reserves to the United States title in all shipwrecks in or on its public lands. See 43 U.S.C. § 2105(d). Thus, if the Shipwreck lies in federal waters, rather than in the State's territorial waters, the ASA would not transfer title to the State and would not constitute a viable basis for the State to interpose a claim.

5. The Supreme Court has confirmed that the meaning of "abandoned" under the ASA conforms to its meaning under admiralty law. See California v. Deep Sea Research, Inc., 523 U.S. 491, 508, 118 S.Ct. 1464, 140 L.Ed.2d 626 (1998). The precise definition of that term and the circumstances under which the Shipwreck might be deemed to satisfy that definition are beyond the scope of this Order. Any consideration of such legal questions at this juncture would be premature.

6. "Embedded" is a term of art defined in the ASA to mean "firmly affixed in the submerged lands or in coralline formations such that the use of tools of excavation is required in order to move the bottom sediments to gain access to the shipwreck, its cargo, and any part thereof." 43 U.S.C. § 2102(a). The Complaint divulges no information from which the State could derive even a preliminary assessment as to the "embedded" status of the Shipwreck.

7. To be sure, there are numerous authorities cited in the briefs and this Order whose captions include references to "unidentified vessels." However, none of those opinions appear to address the propriety of the practice of bringing in rem actions against unidentified vessels, in light of the stringent particularity requirements of the Supplemental Rules. As such, and contrary to Fathom's vague assurances, this question hardly appears "well-settled."

unable to identify the Shipwreck positively at this early stage of the salvage effort because the artifacts recovered thus far are few in number and undiagnostic in tenor. As additional support for its position, Fathom maintains that the State has already filed a responsive pleading through its Verified Statement of Right or Interest (doc. 16) and that the Eleventh Amendment does not confer license on the State to "interfere" with Fathom's federal salvage rights unless the State is in actual possession of the res at issue, which it is not.

### 2. Application of Supplemental Rules C(2)(b) and E(2)(a).

The State's Motion reduces to the questions of whether the Complaint satisfies the reasonable particularity requirements of Supplemental Rules C(2)(b) and E(2)(a) and whether the State is equipped to commence an investigation and frame a responsive pleading on the facts provided therein. Given the paucity of precedents interpreting these rules in the context of salvage operations and unidentified wreck sites, the Court will construe them in a manner reasonably calculated to effectuate their plain language and the purposes of admiralty law.

■ As an initial matter, the Court rejects the State's unduly formalistic, draconian construction of the Supplemental Rules that dismissal is mandated if a salvor brings an action for arrest of a ship-

wreck before it can positively identify the wreckage.[8] To bar a party from pursuing legal action to secure and maintain exclusive salvage rights on a shipwreck until such time as the party can precisely identify the wreck would do violence to time-honored admiralty principles relating to salvage. *See, e.g., Yukon Recovery, L.L.C. v. Certain Abandoned Property*, 205 F.3d 1189, 1196 (9th Cir.2000) (explaining that in general "salvage law encourages salvors to undertake risks to rescue imperiled maritime property"); *International Aircraft Recovery, L.L.C. v. Unidentified, Wrecked and Abandoned Aircraft*, 218 F.3d 1255, 1261 (11th Cir.2000) (noting that "[t]he law of salvage is intended to encourage rescue"). Were the law so to provide, a salvor unable to identify a sunken vessel he discovered would have no recourse through admiralty law to prevent throngs of competing salvors and claimants from descending on the site during the salvage process. In that event, a reasonably prudent salvor would be placed in the untenable predicament of (i) proceeding with salvage operations surreptitiously in hopes that other salvors or claimants would not notice, (ii) making reckless, ill-informed guesses as to the identity of the vessel in order to meet such an identification prerequisite to admiralty protection, or (iii) avoiding salvage operations of unidentified vessels altogether because of the substantial risk that the salvor's efforts might be frustrated by opportunistic interlopers whom the salvor would be legally powerless to fend off. Indeed, it is easy to

8. The textual basis for this contention apparently lies in Supplemental Rule E(2)(a)'s admonition that an *in rem* complaint must be sufficiently particular to allow a claimant to investigate and respond "without moving for a more definite statement." *Id.* The State evidently reasons that, because it has been obliged to file such a motion, the rule requires that the Complaint be dismissed. However, nothing in the rule itself, nor in the ensuing case law, would compel such a harsh result. A more equitable and efficient solution to such a pleading defect would be to afford Fathom an opportunity to amend the Complaint to bring it into compliance with the Supplemental Rules.

envisage a feeding frenzy of competing salvors and claimants swarming around a shipwreck site, each working at cross-purposes to the others to seize artifacts from the site as quickly as possible, creating a chaotic, disorganized atmosphere in which important artifacts may be damaged and significant archeological or historical information may be lost forever. Admiralty law permits a salvor to petition a federal court for protection in its salvage operations precisely to avoid this nightmare scenario and to reward salvors' beneficial recovery activities. The Court fears that the net result of the approach urged by the State would be to chill salvage operations of historical shipwrecks, inasmuch as no rational salvor would want to search for and rescue newly discovered shipwrecks under such conditions.

Based on these providential concerns of practicality, reasonableness, and fundamental fairness, the Court cannot and will not read the Supplemental Rules in a manner unceremoniously to slam the federal courthouse door on any salvor who has not yet divined the name or an exhaustive description of a sunken vessel he has discovered.[9] The State's Motion to Dismiss the Complaint for insufficient particularity is therefore **denied**.

◼ That said, the State's position is not entirely unsympathetic. As mentioned

*supra*, the State's claim to the Shipwreck in this action derives from the ASA. Under that statute, title to all abandoned shipwrecks embedded in the submerged lands of a state is transferred to that state, and salvors' rights are cut off. *See Yukon Recovery*, 205 F.3d at 1196. Therefore, a critical threshold question in this case is whether the Shipwreck is an abandoned vessel embedded in the submerged lands of the State of Alabama. If not, then the State may lack a claim to it. If so, however, the ASA confers upon the State title to the Shipwreck. In that event, Fathom's claims under the laws of salvage and finds would not be cognizable, and this action would be subject to dismissal. In *Zych v. Unidentified, Wrecked, and Abandoned Vessel, Believed to be SB Seabird*, 811 F.Supp. 1300, 1315 (N.D.Ill.1992), the court outlined this scenario as follows:

> "Once the federal court determines that a wreck is both abandoned and embedded, the ASA would vest title to the vessel in the state and eliminate any admiralty claim under the laws of salvage and finds.... In addition, because the laws of salvage and finds generally are the only admiralty causes of action that would confer federal jurisdiction over a shipwreck case, the court would be required to dismiss the action for lack of jurisdiction.... The end result is therefore [that] the state holds title to

---

**9.** In so concluding, the Court is not persuaded by Fathom's discussion of *Treasure Salvors, Inc. v. Unidentified Vessel*, 546 F.Supp. 919 (S.D.Fla.1981). Although Fathom touts the arduous, decade-spanning salvage operation in *Treasure Salvage* as "the best judicial exposition of what is required of a shipwreck finder to positively identify the site being salvaged" (Response, at 2), such exposition cannot rationally be generalized beyond the particular circumstances of the *Treasure Salvage* case. To be sure, there may be situations where a salvor expends untold thousands of man-hours to identify a submerged wreck. But there may also be situations where identifying a wreck is as simple as reading the painted name of the vessel from the inscription on its intact stern or bow. Absent any information about *this* wreck, the Court cannot rely on *Treasure Salvage* as a reasonable predictor of the magnitude and scope of efforts that will be required here antecedent to meaningful identification of the Shipwreck.

the wrecked vessel pursuant to the ASA, and the federal court lacks jurisdiction over any claim for salvage."

*Id.* at 1315.

Under the circumstances, the State's preoccupation with seeking further details of the Shipwreck is entirely appropriate. In investigating its claims under the ASA, the State's chief concerns are whether the Shipwreck is located in Alabama waters, whether the vessel or vessels are "embedded" within the meaning of the ASA, and whether the vessel or vessels may be properly classified as "abandoned" under the ASA. Depending on the facts relating to these particular issues, the State may or may not have a viable claim. In the absence of such information, any responsive pleading that the State might file will of necessity be speculative and conditional (*i.e.,* the State's denial of Fathom's salvage and finder's rights will be contingent on the Shipwreck consisting of one or more abandoned vessels embedded in submerged Alabama lands), and the State's ability to initiate an investigation or frame its responsive pleading will be impaired by the fragmentary factual allegations set forth in the Complaint.

Unfortunately, the Complaint furnishes precious little guidance on these critical questions. To say that Fathom is not required to be omniscient about the Shipwreck from the outset of its salvage operations is not to declare that Fathom may omit from its Complaint reasonably available basic information in its possession that might aid potential claimants in assessing the validity of their claims. Fathom may not know the name of the vessel or vessels, but it surely knows the precise location(s) from which it recovered the four artifacts furnished to the Marshal's Office.[10] Fathom also likely has information relating to where wreckage has been spotted within the two nautical-mile zone identified in the Complaint, whether any conclusions about the nature of the submerged vessel(s) can be drawn from Fathom's now months'-old research and salvage efforts, and whether significant portions of the wreckage appear to be above the ocean floor or embedded within it. This type of data, while preliminary, inconclusive and subject to revision as Fathom's salvage efforts proceed, is likely available to Fathom at this time and would be of profound assistance to the State in shaping its initial investigation and framing an answer.[11]

In light of this analysis, the Court is of the opinion that the Complaint falls short of the particularity requirements set

---

**10.** Admiralty courts have imposed a duty on salvors of historic shipwrecks to map with precision the location from which each artifact is extracted. Indeed, courts have recognized an "archaeological duty of care" requiring that the salvor document the wreck's archaeological "provenance data" by "mapping or recording the location, depth and proximity of each artifact recovered in relation to the other artifacts." *Marex v. Unidentified, Wrecked and Abandoned Vessel,* 952 F.Supp. 825, 829 (S.D.Ga.1997); *see also Cobb Coin Co. v. Unidentified, Wrecked and Abandoned Sailing Vessel,* 549 F.Supp. 540, 558–59 (S.D.Fla.1982) (similar). The Court expects that Fathom has adhered and will adhere to such archaeological duty of care throughout any salvage operations of the

Shipwreck; indeed, Fathom's Complaint specifically alleges that it has complied with "all appropriate shipwreck archaeological protocols" with respect to the Shipwreck. (Complaint, at 2.)

**11.** It is no effective rebuttal to respond, as Fathom does, that the State has already "filed a responsive pleading, namely, a Verified Statement of Right or Interest." (Response, at 4.) Such an argument confuses a statement of claim under Supplemental Rule C(6)(b)(i) with an answer under Supplemental Rule C(6)(b)(iv). That a claimant may have filed a statement of claim does not necessarily imply that he possesses sufficient information to frame an answer and commence an investiga-

forth in Supplemental Rules C(2)(b) and E(2)(a). These rules do not require laser-beam precision in the identification of an unknown wreck, nor do they oblige a salvor to assume the role of oracle or sooth-sayer. But they do require a salvor to relate in its complaint reasonably available information concerning the location, nature, and embedded status of the wreck on which salvage operations are being conducted. This the salvor has not done. On that basis, the State's Motion for More Definite Statement is **granted.**

*3. The Eleventh Amendment Issue.*

Inexplicably, Fathom's response to the State's Motion veers into discussion of the Eleventh Amendment. Citing authority for the proposition that the Eleventh Amendment does not extend immunity to a state which asserts a claim in admiralty to a res not in its possession, Fathom implies that the State is endeavoring to "interfere with Fathom Exploration's right to conduct salvage operations under the protection of the United States District Court." (Response, at 5.) In making this tangential point, Fathom repeatedly declares that no sovereign can interfere with its unfettered right to proceed with salvage operations. (*Id.* at 5–6.) Judicial clarification is warranted to nip this issue in the bud in the early stages of this litigation.

■■ The law is clear that "the Eleventh Amendment does not bar the jurisdiction of a federal court over an *in rem* admiralty action where the res is not within the State's possession." *Sea Services of the Keys, Inc. v. State of Florida,* 156 F.3d 1151, 1153 (11th Cir.1998) (quoting *California v. Deep Sea Research, Inc.,* 523 U.S. 491, 118 S.Ct. 1464, 140 L.Ed.2d 626 (1998)). Had the State interposed a motion to dismiss on Eleventh Amendment grounds, this legal principle would have direct application to such defense. But the State has advanced no jurisdictional challenge. Moreover, the fact that the Eleventh Amendment is no impediment to this Court's exercise of jurisdiction over a vessel not in the State's actual possession does not preclude the State from interposing a valid claim to the wreck under the ASA. *See Deep Sea Research,* 523 U.S. at 507–08, 118 S.Ct. 1464 (concluding that the Eleventh Amendment does not bar district court from resolving state's claims to shipwreck under ASA). As for Fathom's uncorroborated assertion that this Court cannot adjudicate the State's ASA claim until all recovery operations on the Shipwreck have been completed, this timing issue is not squarely before the Court at this time, and therefore will not be decided.[12]

**C. Discussion of Federal Motion.**

The United States' Motion also maintains that the Complaint is insufficient to enable it to respond intelligently. The

tion of the facts, as required under Supplemental Rule E(2)(a).

12. That said, the Court notes in passing that Fathom's interpretation of *Deep Sea Research* as standing for the proposition that "[t]he question of abandonment and the ultimate ownership of its cargo is properly decided only after the salvor in possession has completed its recovery operations," (Response, at 6), is not supported by the cited pages of that opinion. To the contrary, the district court in *Deep Sea Research* applied the ASA before even issuing a warrant for the shipwreck's arrest, finding the state had failed to assert a colorable ASA claim. 523 U.S. at 497, 118 S.Ct. 1464. Besides, it would be a most unusual result if Fathom could continue salvage operations on the Shipwreck after facts came to light making clear that it was subject to the ASA, conclusively defeating Fathom's rights under the laws of salvage and finds. As a practical matter, the Court questions why Fathom would *want* to continue performing salvage operations gratis after the emergence of facts proving that the ASA applies and extinguishing Fathom's rights under the law of salvage and the law of finds. *See generally*

United States' claim to the Shipwreck hinges not on the ASA, but rather on the possibility that the vessel(s) located at the wreck site might be "certain historic Civil War-era shipwrecks belonging to both the Union and the Confederacy." (United States Motion (doc. 17), at 2.) If the Shipwreck consists of vessel(s) subject to Title XIV ("Sunken Military Craft") of the Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005 (the "Act"), the United States asserts, it has an ownership interest in such Shipwreck.[13] But

because the Complaint "does not name, describe, or otherwise identify" the vessel or vessels involved in the Shipwreck, the United States argues that it cannot ascertain whether its ownership rights under the Act attach to such vessel(s). (Motion, at 3–4.)[14] Based on these considerations, the United States calls for Fathom to amend its Complaint to provide the "name, nationality and description of the subject vessel or vessels and any other information plaintiff may have which would assist in identifying same." (*Id.* at 4.)

*Yukon Recovery*, 205 F.3d at 1196 ("A salvor could expend immense resources to locate, survey and salvage a wreck only to have the court later rule that the salvor is entitled to nothing because the ASA displaces the law of salvage."); *Fairport Int'l Exploration, Inc. v. Shipwrecked Vessel Captain Lawrence*, 177 F.3d 491, 498 (6th Cir.1999) (under ASA, "[i]f a diver now discovers a long-lost ship embedded in the submerged lands of a State, a finding of abandonment leaves the diver with neither title nor a salvage award"); *Zych*, 811 F.Supp. at 1315 (where the ASA applies, the state holds title to the wrecked vessel and the court would be required to dismiss an action predicated in the laws of salvage and finds for lack of jurisdiction). Again, these and other questions will have to linger until another day.

**13.** The Act purports to preserve the United States' right, title and interest in all United States sunken military craft, regardless of when they sank, and to prohibit unauthorized possession, disturbance, removal or injury of any such craft. (10 U.S.C. § 113 Note, PL 108–375, Div. A, Title XIV, §§ 1401–02, Oct. 28, 2004, 118 Stat.2094.) The Act further declares that the law of finds shall not apply to any United States sunken military craft and that no salvage rights or awards shall be granted with respect to any such craft without the express permission of the United States. (*Id.* at § 1406(c), (d).) The United States contends that the Act would apply to any Civil War-era warship, irrespective of whether such vessel was aligned with the Union or the Confederacy. *See United States v. Steinmetz*, 973 F.2d 212, 221–22 (3rd Cir.1992) (applying succession doctrine to hold that the Unit-

ed States acquired title to the Confederate steamship ALABAMA after the Civil War ended).

**14.** In a footnote, the United States questions whether the Shipwreck lies within the *in rem* jurisdiction of the Court given the lack of precision of the location of the res and, particularly, Fathom's allegation that the Shipwreck lies "in waters of the Territorial Seas of the State of Alabama and the waters seaward thereof." (Motion, at 3 n. 3.) Of course, "*in rem* actions in admiralty generally require, as a prerequisite to a court's jurisdiction, the presence of the vessel or other res within the territorial confines of the court." *Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel*, 569 F.2d 330, 333 (5th Cir.1978). Nonetheless, jurisdiction may be perfected on a number of theories. *See, e.g., R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 967 (4th Cir.1999) (where a portion of the wreck of the Titanic was within the court's territorial jurisdiction, the district court has constructive *in rem* jurisdiction over the entire wreck as long as the salvage operation continues); *Marex*, 952 F.Supp. at 828 (shipwreck in international waters was subject to *quasi in rem* jurisdiction of federal court during pendency of salvage operations). Without more information as to the precise location of the Shipwreck relative to Alabama's territorial waters, the Court cannot evaluate the United States' nascent jurisdictional comment. When Fathom amends its Complaint with additional details about the location of the res, the parties should reassert any jurisdictional concerns they might have so that same may be resolved expeditiously.

Fathom's opposition to the United States' Motion reiterates many points it made in response to the State's Motion concerning its lack of information as to the identity of the Shipwreck.[15] However, it supplements its arguments relating to the State's Motion with further contentions that (a) the Act does not apply because this action predates the Act's effective date by two days, and (b) the Act does not codify existing law.

■■ The Court will resolve the United States' Motion to Dismiss and for More Definite Statement in exactly the same manner as the State's parallel Motion. Dismissal of this action for failure to comply with Supplemental Rules C(2)(b) and E(2)(a) is unwarranted. Notwithstanding the United States' emphatic contention that Fathom's claim is "premature" until the Shipwreck has been specifically identified (Reply (doc. 30), at 7), the United States does not present a single authority holding that a salvor who finds an unidentified shipwreck site lacks a sufficient basis to initiate an admiralty action *in rem* against the wreck. Moreover, for the reasons stated *supra*, denying a salvor the right to obtain a writ of arrest on a shipwreck until it positively identified the wreck would unfairly compromise the salvor's rights, chill salvage activities, and undermine the principles animating the laws of salvage and finds. That said, to the extent that Fathom possesses more information about the nature, description, and possible identity of the vessel(s), the particularity requirements of the Supplemental Rules oblige it to amend its Complaint so that the United States will have the benefit of such data in commencing its investigation and submitting a responsive pleading.

■ Contrary to the United States' suggestion, denial of the Motion to Dismiss in no way impairs the rights of any vessel owners. As the salvage operation continues and the Shipwreck can be identified with greater precision, the Supplemental Rules contemplate—and this Court will insist—that Fathom take all reasonable steps to notify the owner of such Shipwreck, whomever it may be. The United States is correct that a salvor's right to salvage award may be impaired if the owner of the property does not desire such

---

**15.** Curiously, Fathom offers a variant of its Eleventh Amendment argument as to the United States' claim. Citing language from *Deep Sea Research* suggesting that the federal government cannot successfully challenge a suit on sovereign immunity grounds unless it actually possesses the res, Fathom leaps to the conclusion that the United States cannot interfere with its salvage operations herein unless it actually possesses the Shipwreck. (Response, at 4–5.) This is a *non sequitur.* Sovereign immunity is not the only basis on which the United States can derail Fathom's activities. Fathom again insists that no sovereign can interfere with its salvage operations and that no governmental claims can be adjudicated until such operations are completed. Although the Court need not resolve this issue in this action's present procedural posture, the law appears contrary to Fathom's position. If the Act applies, then intrusive salvage operations on the Shipwreck would apparently be in clear violation of same, subjecting Fathom to the penalties prescribed in the Act. More generally, if the Shipwreck consists of United States property and the United States objects to continued salvage operations, Fathom manifestly "has no right to continue salvage operations over [such] express objections." *International Aircraft,* 218 F.3d at 1263 (holding that federal government, as owner of property subject to salvage efforts, can prohibit such salvage efforts). The Court therefore cannot endorse Fathom's position that it has an absolute right to carry on salvage operations on the Shipwreck, and that the merits of the United States' claim cannot be decided until all salvage operations have come to a close.

salvage. *See International Aircraft Recovery, L.L.C. v. Unidentified, Wrecked and Abandoned Aircraft,* 218 F.3d 1255, 1262–63 (11th Cir.2000) (noting that "salvage cannot be exacted for assistance forced upon a ship" and determining that salvor of sunken aircraft "has no right to continue salvage operations over the express objections" of its owner); *Klein v. Unidentified Wrecked and Abandoned Sailing Vessel,* 758 F.2d 1511, 1515 (11th Cir.1985) (explaining that salvage award requires, *inter alia,* maritime peril from which ship could not have been rescued without salvor's assistance, and finding no marine peril where owner of shipwreck "may not even have desired for the property to be rescued"). Nonetheless, the existence and identity of the Shipwreck's owner is indeterminate at this point. It would defy logic to bar Fathom from conducting salvage operations on the Shipwreck until the owner is notified, when the owner's identity itself cannot be ascertained without further salvage activities. Taken to its logical conclusion, the United States' position would effectively create a moratorium on salvage operations on the Shipwreck. The Court does not agree that such drastic measures are necessary to protect the rights of an unknown owner who may or may not exist, and who may or may not object to the ongoing salvage operations.

If Fathom wishes to proceed with salvage operations, it does so subject to the risk that (a) the vessel's owner may not be deemed to have abandoned title to it, (b) the vessel may not be deemed in marine peril, (c) the owner may reject Fathom's "offer" of salvage assistance, or (d) as mentioned *supra,* the vessel could be subject to the ASA. However, that Fathom *might* not be eligible to assert title over the Shipwreck or to recover a salvage award for its efforts is not a valid basis for dismissing the Complaint at this juncture to protect the interests of unknown owners based on the United States' speculation that such owners may claim a viable, intact interest in the Shipwreck.[16]

The Court declines to enmesh itself in the parties' maelstrom of briefing concerning whether the Act applies to this dispute, whether the Act is a codification of prior law, and the circumstances under which the United States may be deemed to have abandoned sunken vessels. This action is before the Court not on a motion for summary judgment but on a preliminary motion as to the sufficiency of the Complaint to place potential claimants on notice of Fathom's activities. The parties' skirmish as to the merits of the United States' claim is premature.[17] At this moment, there is no evidence that the Shipwreck consists of property that is, or was at one time, United States property. The Court therefore will not issue an advisory opinion as to the continuing vitality of the United States' ownership interest, and the attendant rights of Fathom, if the Shipwreck happens to turn out to be a United States military craft. Any such ruling would place the cart before the horse by address-

**16.** The Court recognizes that on January 10, 2005, the United States gave written notice to Fathom that neither the Department of the Navy nor any other federal agency has authorized it to conduct salvage operations on United States property in or near Mobile Bay. To the extent, then, that the Shipwreck is United States property which the United States has not abandoned, Fathom conducts salvage operations on that site at its own risk.

**17.** Ironically, as a preface to a five-page argument relating to whether and when the federal government abandons ownership of sunken naval vessels, the United States accurately observes that "these arguments are premature." (Reply, at 9.)

ing precipitate legal issues that may not even be germane to this dispute. The parties are, of course, welcome to renew their arguments (in a proper procedural framework) should future revelations about the Shipwreck warrant their doing so.

## III.  Conclusion.

For all of the foregoing reasons, the Motions to Dismiss (docs.17, 22) brought by the United States and the State are **denied**. The Complaint will not be dismissed at this time for noncompliance with Supplemental Rules C(2)(b) and E(2)(a). However, the respective Motions for More Definite Statement set forth in those same pleadings are **granted** pursuant to Supplemental Rules C(2)(b) and E(2)(a). Fathom is hereby ordered, on or before **February 4, 2005**, to file an Amended Complaint setting forth such additional reasonable details as it may have concerning the identity, nature, precise location and embedded status of the Shipwreck, consistent with this Order.[18] The claimants' answers to such Amended Complaint will be due on or before February 24, 2005.

---

18.  Fathom need not fear that this directive effectively obliges it to present information it does not possess, or that it will be irrevocably locked in to the narrow, incomplete specifics it provides in its amendment. This Order does not command that Fathom undertake mission impossible; rather, it requires only that Fathom provide such information about the Shipwreck as it reasonably possesses at this time, subject to such reasonable caveats as it may deem appropriate. Should Fathom become aware at a later time of substantial changes in its information about the Shipwreck, it can (and should) move promptly to amend its Complaint or otherwise to ensure timely notice of those changes to potential claimants.